TOKIO MARINE & FIRE INSURANCE COMPANY, LTD., Plaintiff, Appellant,

v.

The GROVE MANUFACTURING COMPANY, et al., Defendants, Appellees.

No. 91–1380.

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1991.

Decided March 19, 1992.

Timothy Wilton with whom Richard P. Campbell, Amy J. Davids and Campbell & Associates, P.C., Cambridge, Mass., were on brief, for plaintiff, appellant.

Amancio Arias Guardiola with whom Arias Cestero & Arias Guardiola, Hato Rey, P.R., was on brief, for defendant, appellee Shintron Co., Inc.

Dario Rivera–Carrasquillo with whom Cordero, Miranda & Pinto, Old San Juan, P.R., was on brief, for defendants, appellees Grove Mfg. Co., et al.

Before CAMPBELL and TORRUELLA, Circuit Judges, and BOWNES, Senior Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Plaintiff-appellant, Tokio Marine & Fire Insurance Co. ("Tokio"), appeals from a directed verdict in favor of defendants-appellees, Grove Manufacturing Co. ("Grove") and Shintron Company Inc. ("Shintron"). Tokio contends that the district court erred in: (1) directing a verdict in favor of Shintron; (2) excluding the testimony of one of its expert witnesses; and (3) limiting the testimony of a second expert. We affirm.

## BACKGROUND

This appeal arises from the destruction of a giant video screen (known as the "Diamond Vision Ocean One") during its installation at Plaza Las Americas Mall in Puerto Rico. The screen is similar to those used in baseball stadiums to flash images of players, the game and advertisements. The screen was composed of two large units, each one the size of a sea cargo container. When assembled, the units were stacked on top of an empty cargo container that served as a base. Diamond Vision Inc. ("Diamond")—Tokio's insured—owned the screen and Grove manufactured the screen.

Beginning on April 3, 1985, Tamachi, Inc.—a Puerto Rican car dealer—leased the screen from Diamond for use in a promotion campaign. Pursuant to the lease agreement, Diamond was to provide a supervisor for the erection and installation of the screen and Tamachi was responsible for obtaining a crane and a crane operator to assemble the screen. For these purposes Diamond hired Shintron to supervise the installation (Shintron in turn sent two employees to Puerto Rico) and Tamachi hired the Milton Andrews Crane Company ("Milton") to supply a crane and operator.

A number of problems arose during the screen's assembly. First, the 30 ton crane originally brought by the Milton employees had to be exchanged for a 45 ton crane because of the screen's weight. Second, the cargo container which had been purchased to serve as the base for the screen had to be changed because it was not strong enough. After all the appropriate equipment was finally obtained, the lower unit of the screen was placed on top of the base without incident. When the crane attempted to lift the upper unit, however, the crane was straining and the boom was lowered. When the upper unit was lifted again, one of Shintron's men noticed that electronic cables were dangling from it. He entered the lower unit and reached through a hatch to try to catch the dangling cables. During this time he apparently made some hand signals to the crane operator. The crane subsequently tipped over destroying the screen.

Diamond submitted an insurance claim to Tokio for the screen's damages. Tokio paid its insured $1,800,000 on the claim and then brought suit against Milton, Grove and Shintron. The case against Milton was settled for $500,000. In the remaining claims, Tokio alleged that the accident was caused by a defect in the crane—for which Grove was strictly liable and by the negligence of the two employees of Shintron who were supposed to supervise the installation of the screen. Tokio sought to recover the full amount of the claim it paid to Diamond.

At trial, after Tokio presented its case to the jury, both Shintron and Grove moved for a directed verdict, arguing that there was no more than a "scintilla" of evidence on either the strict liability claim or the negligence claim. The district judge agreed and directed a verdict in favor of Grove and Shintron and against Tokio. This appeal followed.

### DIRECTED VERDICT IN FAVOR OF SHINTRON

■ A directed verdict is appropriate if "viewing the evidence in the light most favorable to the non-moving party," and giving plaintiff "the benefit of every legitimate inference" the court determines that "reasonable jurors could come to but one conclusion." *Goldstein v. Kelleher*, 728 F.2d 32, 39 (1st Cir.), *cert. denied*, 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984) (citations omitted); *see also Richmond Steel Inc. v. Puerto Rican American Insurance Co.*, 954 F.2d 19, 22 (1st Cir.1992); *Malave–Felix v. Volvo Car Corp.*, 946 F.2d 967, 970 (1st Cir.1991). A "mere scintilla" of evidence, however, is not enough to send the case to the jury. *Richmond Steel Inc.*, 954 F.2d at 22; *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1088 (1st Cir. 1989). Moreover, "plaintiff may not rely on conjecture or speculation, rather the evidence offered must make 'the existence of the fact to be inferred more probable than its nonexistence.'" *Richmond Steel Inc.*, 954 F.2d at 22 (quoting *Carlson v. American Safety Equip. Corp.*, 528 F.2d 384, 386 (1st Cir.1976)).

The United States District Court for the District of Puerto Rico directed a verdict in favor of Shintron finding that Tokio had failed to produce sufficient evidence that Shintron was negligent or that the alleged negligence was the proximate cause of Tokio's damages. *Tokio Marine & Fire Ins. Co., Ltd. v. Grove Mfg. Co., et al.*, 762 F.Supp. 1012 (D.P.R.1991). The court also held that Tokio failed to provide sufficient evidence concerning the damages suffered. *Id.* at 1015. After a thorough review of the record, we hold that the directed verdict in favor of Shintron was appropriate.

Under Article 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 5141, "a person who by act or omission causes damages to another through fault or negligence shall be obliged to repair the damage so done." To state a claim for damages under this provision based on negligence, a plaintiff must prove that (1) defendant owed a duty to prevent the harm by conforming to a reasonable standard of conduct; (2) defendant breached that duty through a negligent act or omission; and (3) the negligent act or omission caused the plaintiff's harm. *Ottimo v. Posadas de Puerto Rico Assoc. Inc.*, 721 F.Supp. 1499, 1500 (D.P.R.1989); *see also* W. Keeton, *Prosser and Keeton on the Law of Torts*, § 30 at 164–65 (1984); *Hernandez v. Fournier*, 80 P.R.R. 94, 96–97 (1957).

Tokio's claim of negligence depended essentially on the following evidence:

(1) A leasing contract between Diamond and Tamachi in which Diamond agrees "to provide a supervisor for the erection of Leased Equipment" and the undisputed fact that Diamond hired Shintron to act as supervisor;

(2) the testimony of several witnesses that the Shintron employees were in charge of directing the installation and stacking of the screen based on the observations that

—the Shintron employees made the initial determination that the first base container was inappropriate and needed to be replaced with a stronger base container,

—the Shintron employees told the crane operators which screen unit to place first,

—the Shintron employees made hand signals to the crane operator during the stacking of the screen's upper unit;

(3) testimony that the Shintron employees were responsible for making the electronic connections for the screen and for training others to use the screen once erected;

(4) testimony that the Shintron employees were present every time the screen was moved and erected at another location;

(5) testimony that prior to the accident electronic cables were observed hanging from the screen's upper unit while it was in the air and that one of the Shintron employees entered the lower unit, reached through a hatch and tried to catch the dangling cables;

(6) testimony that while trying to catch the dangling cables a Shintron employee made some hand signals to the crane operator;

(7) testimony that the accident occurred shortly after the hand signals were observed.

Tokio contends that based on this evidence, a reasonable jury could have found that Shintron's responsibility was to supervise the stacking of the screen units—including directing the operations of the crane; that they performed this obligation negligently by directing the crane operator to extend the load beyond the safe radius; and that this caused the accident and resulting destruction of the screen. Without considering the credibility of Tokio's witnesses, and making all fair inferences in Tokio's favor, we find this contention completely without merit.

First, the evidence did not demonstrate that the supervisory duties of Shintron extended to responsibility for the detailed operations of the crane. The lease contract between Tamachi and Diamond provided that Tamachi, not Diamond (who engaged Shintron), was responsible for supplying and paying the costs of crane services. Tamachi hired the Milton Andrews Crane Company, which supplied the crane and employed its operator. There was uncontroverted testimony that the crane operator placed the screen's lower unit on top of the base container without any direction from the Shintron employees except for the indication of which unit went first. Tokio presented no evidence suggesting that the Shintron employees knew, should have known or would have been expected to know how a crane operates so as to be able to direct the actual details of its operation from the ground.

Second, even assuming there was an issue of fact as to whether Shintron had a duty to oversee the details of the crane operation, evidence is lacking of any act or omission by the Shintron employees that could provide the basis of a finding of negligence. To prove that the Shintron employees acted negligently, Tokio needed to present evidence indicating that they acted below a minimum standard of care. *Ocasio–Juarbe v. Eastern Airlines, Inc.*, 902 F.2d 117 app. at 120 (1st Cir.1990) ("[t]he standard of conduct for determining whether or not an act is negligent, is defined by the mythical figure of the reasonable prudent man...."). Tokio presented no expert testimony regarding how a crane should be operated, how persons on the ground may communicate with the crane operator, and how the signals supposedly given here might be interpreted. While there was evidence that Shintron employees gave hand signals, no one explained what these might have meant or in what manner they might have constituted negligence. No jury could reasonably conclude that the Shintron employees exercised less than reasonable care from the unexplained fact that they were seen to make hand signals of some type to the crane operator and that an accident subsequently occurred.

Third, Tokio presented no evidence that the Shintron employees' actions or omissions were the proximate cause of the accident damaging the screen. The fact that witnesses testified that the accident occurred shortly after a Shintron employee was observed making hand signals to the

crane operator does not prove that the hand signals caused the accident. There was no evidence as to the nature of the hand signals, whether the crane operator understood them, whether he followed them, or whether—if he did follow them—they instructed him to operate the crane in a manner to have caused the accident. In fact there was no evidence as to why the crane tipped over in the first place.[1]

Tokio contends, in the alternative, that even if the Shintron employees had no responsibility for directing the crane operation, the evidence is clear at a minimum that they failed to secure an electronic cable on the screen's upper unit and that it was while they were making an effort to guide this cable that the accident occurred. This speculative contention suffers from the same deficiencies as Tokio's first theory. While the evidence indicated that electronic cables were hanging from the screen's upper unit as it was lifted and that one of the Shintron employees attempted to catch the cables right before the accident, no evidence was presented to establish that the cables were loose because of the Shintron employees' negligence or that the Shintron employee's attempt to re-hook these cables was related to the accident.

We agree with the court below that no jury could reasonably have concluded from the evidence presented that the Shintron employees acted negligently or that their alleged negligence was the proximate cause of the accident leading to the destruction of the screen. Consequently, the district court correctly directed a verdict in favor of Shintron.

## EXPERT TESTIMONY

On appeal, Tokio makes little effort, nor could it, to challenge the district court's determination that, as a matter of law, on the evidence actually admitted, Grove could not be held liable. Rather, Tokio contends that the court's exclusion of its expert witness, Philip Alterman, was reversible error, in that the court's ruling improperly denied Tokio the opportunity to present key evidence that the crane manufactured by Grove was defective. The defect, Tokio asserts, was the absence of a so-called load moment indicator, a warning device that allegedly would have prevented the overturning of the crane and the damage to the screen. Alterman supposedly would have provided the expert testimony on the basis of which the jury could have found that the Grove-manufactured crane, lacking such a device, was defective. Tokio further contends that Alterman would have testified to what caused the crane to tip over—evidence which was necessary for its claims against both Shintron and Grove.

■ District judges have broad discretion in determining the qualification of an expert witness and the admissibility of expert testimony. *Richmond Steel Inc. v. Puerto Rican American Insurance Company*, 954 F.2d 19, 21 (1st Cir.1992) (citing *Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir.1985); *Nickerson v. G.D. Searle & Co.*, 900 F.2d 412, 419 (1st Cir.1990); *Da Silva v. American Brands, Inc.*, 845 F.2d 356, 361 (1st Cir.1988); *International Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 544 (1st Cir.1988); *Lynch v. Merrell–National Lab.*, 830 F.2d 1190, 1196–97 (1st Cir.1987)). A trial court's decision to exclude expert testimony, therefore, will not be reversed "as a matter of law" absent a finding of clear error. *Id.; Da Silva*, 845 F.2d at 361; *Payton*, 780 F.2d at 155.

■ At trial Tokio offered Alterman as an expert on cranes and in crane accident investigations and safety. The district court refused to qualify him as such under Rule 702,[2] finding that "the education and

---

1. The district court observed that the evidence suggested that the crane operators were responsible for their acts as operators, that "[t]hey miscalculated the capability and capacity of the crane required for the job [and that] [a]s a consequence of such miscalculation the crane tilted, tumbled over and the accident ensued." *Tokio Marine & Fire Ins. Co.*, 762 F.Supp. at 1014–15. Whether or not this is so, Tokio's evidence of fault by Shintron was insufficient to go to the jury.

2. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier or fact to un-

experience of Philip Alterman, proposed expert in crane defects, does not qualify him as an expert witness." *Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 762 F.Supp. 1012, 1016, 1017 (D.P.R.1991). The record establishes that Alterman has a B.S. in civil (not mechanical) engineering, was licensed as a civil engineer in Pennsylvania and worked for a corporation of consultants organized to assist the insurance industry and lawyers by providing technical information in conjunction with accident investigations. He claimed to be an expert in crane accidents who had investigated over 60 crane cases—20 or 25 of them involving hydraulic cranes, such as that here. In addition, he had some experience preparing design specifications for the purchasing of cranes. Alterman admitted, however, that he had never operated nor performed maintenance on a crane. He had never designed cranes nor worked for a crane manufacturer. There was no evidence of publication or in-depth study on the subject of cranes. He conceded that he was not an expert in crane maintenance nor in crane operation. He also conceded that he was not an expert on load moment indicators, although he said he had "knowledge about it."

Alterman admitted to having testified as a professed expert in an extraordinary array of dissimilar fields: construction safety, scaffolding, real estate appraisals on industrial facilities, fire protection systems, bulk oil terminals, cargo waterfront terminals, bridges, high rise construction, construction of highways, construction of race tracks, the field of construction management, the field of drainage projects, construction of containerized cargo facilities, the field of construction estimating, the field of waste treatment plants and water treatment plants, industrial buildings, wire ropes and wire cables, and opened wedged sockets. Alterman testified to regarding himself as a member of the team that was preparing this case for Tokio, and to having telephoned people at Grove without revealing his identity to secure information helpful to his client. He also testified that he had never examined the crane involved in the accident in the present case, nor had he spoken to its operator.

Based on the foregoing, we hold that the court's decision to refuse to permit Alterman to testify as an expert in this case was not clear error. Alterman's opinion on whether or not the absence of a load moment indicator was a "defect" called, in essence, for meaningful cost-benefit analysis. This required, in turn, considerable familiarity with the device itself; with how hydraulic cranes work and are operated; with crane design, manufacture and marketing; with applicable industry standards; and so on. Alterman, however, testified that he was not an expert in either load moment indicators or crane operation, that he had no crane operations experience, and that he had not worked for a crane manufacturer. His background did little to suggest expert knowledge of relevant economic issues and industry standards. A closer question, perhaps, is whether he was qualified to render an opinion on how the accident had occurred. His stated background included investigating the cause of many crane accidents. However, Alterman had not inspected the crane involved in the present accident, nor had he spoken to its operator. The judge concluded, supportably, that Alterman was "more a professional witness than an expert in crane defects."[3] *Id.* at 1018. In a field like acci-

---

derstand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Fed.R.Evid. 702.

**3.** Quoting the Fifth Circuit's decision in *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233-34 (5th Cir.1986), the judge stated:

Experts also run the risk of becoming "nothing more than an advocate of policy before the jury."

\* \* \* \* \* \*

The fact that a person spends substantially all of her time consulting with attorneys and testifying in trials is not a disqualification, but it is not an automatic qualification guaranteeing admission of expert testimony. Experts whose "opinions are available to the highest bidder have no place testifying in a court of law, before a jury; and with the imprimatur

dent reconstruction that is more art than science, the trial judge has particular liberty to eschew "professional witnesses." *See In re Air Crash Disaster*, 795 F.2d at 1233 ("[t]his deference reflects the superior opportunity of the trial judge to gauge both the competence of the expert and the extent to which his opinion would be helpful to the jury.... In deciding whether *explanation* by an expert will assist the jury, the superior position of the trial judge over the appellate judge is apparent...."); *see also* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 702[02] at 702–28 (1991) ("in automobile accident cases, the trial judge has been affirmed regardless of whether he admitted or excluded the proffered expert testimony of an 'accidentologist.'") (citations omitted).

Appellants complain that the district court applied too strict a standard in rejecting Alterman's testimony on grounds such as that he did not possess a degree in mechanical engineering and that he had insufficient experience with the design and manufacture of cranes. It is true that Rule 702 does not require specific educational training in the area of expertise and that an expert need not have design experience with the particular product in order to render expert opinion about the unreasonableness of its design. *See Da Silva*, 845 F.2d at 361; *see also United States v. Paiva*, 892 F.2d 148, 160 (1st Cir.1989) ("[a] witness may qualify as an expert on any one of [Rule 702's] five listed grounds."). The court was clear, however,

that it was Alterman's failure to measure up in any one of several possible ways—educationally or experientially—that led to his rejection: "[a] true expert in crane defects would be a mechanical engineer, a person with vast experience in the design and manufacture of cranes, *or* a person involved in the teaching thereof." *Tokio Marine & Fire Ins. Co.*, 762 F.Supp. at 1018 (emphasis supplied); *see Da Silva*, 845 F.2d at 361 ("a court should consider all relevant qualifications when ruling on the admissibility of expert testimony"). Having reasonably found that Alterman lacked the experience, training or education to testify as to crane defects, and that his "hired gun" background as an instant expert in an astonishing number of other areas suggested he "would not possess the professional safeguards ensuring objectivity," *Tokio Marine & Fire Ins. Co.*, 762 F.Supp. at 1017, the court did not abuse its discretion in excluding his testimony.[4]

### CONCLUSION

For the foregoing reasons we affirm the district court's grant of a directed verdict in favor of Shintron and Grove.[5]

*Affirmed.*

---

of the trial judge's decision that [s]he is an 'expert[,]'" and the trial judge must decide whether the signs of competence and of contribution of the proposed expert will aid in clearly presenting the dispute.
*Tokio Marine & Fire Ins. Co.*, 762 F.Supp. at 1018; *see also Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir.1989) ("Although it would be incorrect to conclude that [witness's] occupation as a professional expert alone requires exclusion of her testimony, it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying.").

**4.** Some of the district court's comments could, in isolation, be construed as imposing higher standards on the qualifications of experts than those permitted by law. See, for example, its comments that "the most qualified of experts

also have an extensive list of published works" and that an example of "an expert in the true sense of the word" is "one who had a chair at MIT and had written extensively in mechanical engineering journals." *Tokio Marine & Fire Insurance Co.*, 762 F.Supp. at 1018. Viewing the court's analysis as a whole, however, and considering it in light of Alterman's credentials as revealed at the voir dire, we are satisfied that there were sufficient grounds for the court to doubt Alterman's expertise to testify to crane defects and to the causes of this accident.

**5.** Because we hold that Tokio failed to present even a scintilla of evidence that the Shintron employees were negligent, we need not reach the question of whether or not the district court appropriately limited the testimony of Tokio's expert on damages.