USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1280 JUDITH A. VADALA, EXECUTRIX OF THE ESTATE OF P.A. VADALA, a/k/a PATRICK A., and VADALA MANAGEMENT CORPORATION, Plaintiffs, Appellants, v. TELEDYNE INDUSTRIES, INC., Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Patricia D. Stewart with whom Timothy J. Healey and Healey & ____________________ ___________________ ________ Stewart were on brief for appellants. _______ Peter M. DelVecchio with whom Jerome M. Leonard and Ropes & Gray ___________________ __________________ _____________ were on brief for appellee. ____________________ January 10, 1995 ____________________ BOUDIN, Circuit Judge. In December of 1986, Patrick _____________ Vadala purchased a used twin-engine Cessna airplane; at that time, both the airplane and the engines (made by a division of Teledyne Industries) were approximately 20 years old. On July 14, 1988, after logging fewer than 50 hours on the airplane, Vadala reported a loss of oil pressure in the right engine to air traffic controllers while attempting to land at Taunton Airport in Massachusetts. Several minutes later, the plane crashed and burned. Vadala was killed, and most of the wreckage was destroyed in the post-crash ground fire. Vadala's widow Judith and Vadala Management Corp., the title owner of the plane, sued Cessna and Teledyne, alleging negligence and breach of warranty under Massachusetts law. The plaintiffs settled with Cessna, leaving Teledyne as the sole defendant. Nearly three years after the complaint was served, Teledyne moved for summary judgment. The district court granted Teledyne's motion on the ground that the plaintiffs had failed to adduce evidence to support their theory of causation. To understand the plaintiffs' theory, and the district court's reasoning, requires a brief technical explanation. Each of the Teledyne engines mounted on the Cessna contained a component, known as a viscous torsional damper. The damper attaches to the engine and functions to reduce the engine's twisting (or "torsional") vibration. Without the -2- -2- damper, the torsional vibration of the engine might place undue strain on other engine parts. Control of torsional vibration is required in order to comply with Federal Aviation Administration regulations. The Teledyne damper is a small disk comprised of an inner brass ring that floats in a very thin layer of silicone fluid; the ring and fluid are encased by an outer steel shell. The silicone fluid absorbs the torsional vibration and dissipates it as heat. Exposure to very high temperatures, however, will cause the silicone in the damper to solidify, becoming first a gel and then a rubbery substance. This process is known as "polymerization." When polymerization occurs, the damper's effectiveness is decreased. An investigation of the plane and the crash site by the National Transportation Safety Board concluded that at some point--either during the Cessna's final flight or afterward in the ground fire--the silicone in the right engine's viscous torsional damper had polymerized. The left-engine damper had also polymerized. The accident was apparently caused when an engine part in the right engine, the starter adapter, came loose from the bolts that hold it to the engine and compromised the oil seal, causing the oil to drain out and the engine to fail. The NTSB investigation did not determine what caused the holddown bolts to come loose. -3- -3- The plaintiffs alleged that the right-engine damper polymerization occurred during the flight, which caused a ball bearing to fail, which in turn caused the bolts to loosen. Teledyne contended that the polymerization occurred after the crash in the ground fire, and that polymerization would not in any event lead to ball bearing failure. The district court looked no further than the plaintiffs' first premise--that polymerization occurred during, rather than after, the flight--and found it to be unsupported. That was the basis for the grant of summary judgment in favor of Teledyne. We review a grant of summary judgment de novo and view _______ the record in the light most favorable to the nonmoving party. FDIC v. Bay Street Development Corp., 32 F.3d 636, ____ _____________________________ 639 (1st Cir. 1994). Here, given their theory of causation, the plaintiffs bore the burden of proof to show that it was more likely than not that in-flight polymerization occurred in the right engine damper. E.g., Carey v. General Motors ____ _____ ______________ Corp., 387 N.E.2d 583, 585 (Mass. 1979). Plaintiffs' task _____ was to show a genuine factual dispute on this issue by pointing to evidence from which a jury could find in plaintiffs' favor. Anderson v. Liberty Lobby, Inc., 477 U.S. ________ ___________________ 248 (1986). To show that polymerization occurred during the flight and not afterward in the ground fire, the plaintiffs relied -4- -4- centrally on affidavits and depositions of their expert, Roy Bourgault. This circuit has previously held that in order to defeat a motion for summary judgment, an expert opinion must "at least include the factual basis and the process of reasoning which makes the conclusion viable." Hayes v. _____ Douglas Dynamics, Inc., 8 F.3d 88, 92 (1993). We agree with ______________________ the district court that the factual basis and process of reasoning relied on by the plaintiffs' expert do not make his conclusions viable. Bourgault examined the damper from the right engine and concluded that the polymerization had occurred during the flight. He based his opinion on his observation that components adjacent to the damper in the right engine, namely, the rubber oil seal and O rings, showed no signs of heat damage from the ground fire; he therefore inferred that polymerization must have occurred during flight rather than in the ground fire. As the district court pointed out, however, Bourgault admitted that he had no idea what temperature would be required to alter the appearance of the O rings and oil seal. Bourgeault's admission is especially damning because it had to be clear to the plaintiffs that pretty persuasive testimony from the expert was needed to cope with the inference that the right engine damper had polymerized after the crash. After all, there had been a severe post crash -5- -5- fire; the left engine damper was also found to be polymerized to approximately the same extent as the right; and there was no claim that it had been damaged in flight. The NTSB report said that the right engine "suffered fire and impact damages" and, in cataloguing damaged parts, said that the right engine damper "had received extensive heating damage--paint blackened and blistered." Abstractly, Bourgault's conclusion that the damper had not been damaged by ground-fire heat depended on the notion that any ground-fire heat sufficient to cause polymerization would also have altered the appearance of the rubber oil seal and O rings. The inference is difficult to sustain unless the expert has some notion of how susceptible the latter parts were to having their appearance altered by heat. Bourgault's testimony leaves the impression that he had very little idea. Of course, he may have had an answer--one can imagine several--but none appears in his deposition or affidavits. The only other important basis for Bourgault's opinion lies in four documents: two Teledyne service bulletins, a test report done for Teledyne by another company, and the advertisement of a competitor. One of the bulletins and the test report can fairly be taken to suggest that in some cases engine heat has caused premature reduction or loss of damping capability in some of Teledyne's dampers. Teledyne (among -6- -6- other rejoinders) asserts that these materials may establish that dampers could suffer in-flight damage but that this is no evidence that the right-engine damper in this case ______________ suffered such damage. This overstates the matter. Certainly the fact that there is a pattern of occurrences, reflecting an apparent cause and effect sequence, can strengthen the likelihood that the present case is one more in the pattern. This is how human beings reason about circumstantial evidence. But the strength of the inference depends very much on further facts, for example, the comparative frequency of the pattern and the tightness of the match between the perceived pattern and the present accident. In this case, the materials do not indicate that in- flight, heat-caused damper failure is a major problem that occurs often; and as for fit, the materials may actually counter the plaintiffs' inference by suggesting that other features--not present here--tend to increase the likelihood of, or occur with, in-flight damper failure. Thus, the documents may be of slight help to Bourgault's surmise, or may actually hinder it; but either way, they do not bolster his opinion sufficiently to permit a reasonable factfinder to conclude that this damper more probably than not failed in flight. -7- -7- At oral argument, plaintiffs' counsel suggested that the district court decision may conflict with Daubert v. Merrill _______ _______ Dow Pharmaceuticals, Inc., 113 S. Ct. 2786 (1993). Daubert's _________________________ holding--that a scientific principle may sometimes be the basis for expert testimony even if it is not "generally accepted"--has nothing to do with this case, in which the dispute concerns an event rather than a scientific law. More pertinent is Daubert's countervailing precept: that the _______ trial judge is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 113 S. Ct. at 2799. The district judge properly relied on this latter precept in deciding that Bourgualt's testimony did not constitute admissible expert evidence. This was not because of any flawed scientific principle--heat admittedly can cause in-flight polymerization--but because there was no substantial basis for concluding that it had done so here. The same result would follow even if Bourgault's testimony were admitted for what it is worth; the evidence not being sufficient to permit a reasonable jury to find in the plaintiffs' favor, the court had no alternative but "to direct a judgment, . . . and likewise to grant summary judgment . . . ." Daubert, 113 S. Ct. at 2798. _______ After the district court entered summary judgment, plaintiffs moved to vacate the judgment under Fed. R. Civ. P. -8- -8- 60(b), and submitted several additional items of evidence. The district court denied the motion on the ground that the evidence was not "newly discovered," as the rule requires. See, e.g., Parrilla-Lopez v. United States, 841 F.2d 16, 19 ___ ____ ______________ _____________ (1st Cir. 1988). The court also explained why the new evidence, even if considered, would not alter its conclusions. Because the first ground is sufficient, and the belated evidence not especially potent, no further discussion of the point is necessary. Finally, we have considered other claims offered on both sides but found them lacking in substance. In particular, the defense expert assuredly did not concede plaintiffs' theory of causation; nor is it plausible for the defense to argue that plaintiffs waived their entire claim by failing to object to a supposed uncontested fact submitted by the defendant. Judges, like everyone else, have their failings; but in devising their arguments, counsel ought to give the bench some credit for common sense. Affirmed. ________ -9- -9-