**Jacqueline GREEN, Individually and as Personal Representative of the Estate of William Green**

**v.**

**CESSNA AIRCRAFT CO. et al.**

Supreme Judicial Court of Maine.

Argued Jan. 3, 1996.
Decided March 22, 1996.

Frederic A. Swartz (orally), Alan L. Cantor, Swartz & Swartz, Boston, Sumner H. Lipman, Lipman & Katz, P.A., Augusta, for Plaintiff.

Gerald F. Petruccelli (orally), James B. Haddow, Petruccelli & Martin, Portland, Phillip E. Johnson (orally), Johnson, Webbert & Laubenstein, Augusta, for Defendants.

Before ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

ROBERTS, Justice.

Jacqueline Green appeals from a summary judgment entered in the Superior Court (Kennebec County, *Alexander, J.*) in favor of defendants Cessna Aircraft Company and Maine Instrument Flight. On appeal Green argues that the court erred by assessing the weight and credibility of her experts' opinions rather than determining that there was a genuine issue of material fact whether a defect in William Green's airplane caused it to crash. We affirm the judgment.

This case arises from the following substantially undisputed facts. Shortly after noon on July 14, 1990, William Green attempted to land his six-passenger Cessna seaplane on Togus Pond near Augusta. Two eyewitnesses stated that the plane circled and then began to land directly downwind and that it made a normal approach and landing. After the plane had taxied, the left float lifted slightly from the surface of the water causing the plane to tip to the right. The float settled and the plane continued to taxi for about 150 feet. One of the eyewitnesses, himself a pilot and flight instructor, stated that the plane taxied "on the step," that is, the plane was going fast enough to hydroplane. As the plane passed by an adjacent island into more open water, it again began tipping to the right. The right float submerged until the right wing tip hit the water, at which time the plane "cartwheeled." One of the witnesses stated that the winds on Togus Pond are unpredictable and that it appeared the wind caught the wing or that the plane made a left turn and tipped over "like a tricycle." The other eyewitness stated that the plane was in an area on the lake where the wind is stronger due to a funneling effect. Three bystanders rescued an unconscious Green from the overturned plane. He later died, without regaining consciousness.

A National Transportation Safety Board (NTSB) investigator inspected Green's plane within hours after the accident. He noted that both the flap lever and indicator were at twenty degrees. He also noted that the right wing was partially separated from the fuselage and that the flaps on both wings were at twenty degrees. The plane was subsequently dismantled and transported to an airport in Waterville.

Jacqueline Green, William's widow and the personal representative of his estate, brought the instant action after the experts she hired concluded that the retract cable, which controls the flaps used by pilots to increase or decrease altitude, broke prior to William's use of the flaps for the landing.[1] When the retract cable broke, according to this theory, its sudden movement jerked the follow-up cable out of the clamp that attaches the two cables. With the follow-up cable not working, the flap indicator would not be "told" when the flaps reached the point William had asked for on landing and thus could not have shut off the flap motor. The flaps would continue moving until they could go no fur-

---

1. The pilot must extend the flaps when landing the plane to create drag and decrease air speed. To do this, the pilot moves a flap lever in the cockpit. Movement of the lever turns on a microswitch, which in turn activates a motor in the right wing. The motor causes a retract cable, which extends from the right wing to the left wing, to move the flaps either up or down. A flap indicator tells the pilot the degree of the flaps. The flap indicator moves when a follow-up cable tells it to. The follow-up cable is attached via a clamp to the retract cable. As the retract cable moves, it pulls the follow-up cable with it. As the flaps reach the requested setting, the indicator turns off the flap drive motor, stopping the movement of the retract cable.

ther (full flaps), or on this plane forty degrees. Metallurgical testing, however, showed that the failure of the retract cable must have resulted from a single overload; namely, the crash. As a result of this finding, Green's experts concluded that, since the retract cable had not failed prior to the crash, the failure of the follow-up cable caused the crash. Green's expert mechanic concluded that the follow-up cable slipped out of the clamp holding it onto the retract cable prior to the crash. Using a microscope, Green's metallurgist found crushing and fatigue factors of individual strands of the follow-up cable at the point where the clamp was placed. He concluded that the cable separated from the clamp, at least partially, as a result of the clamp being over-tightened. He was unable to determine if the cable separated before or as a result of the crash.

Following discovery, Cessna and Maine Instrument Flight moved for a summary judgment. The court granted the defendants' motions, finding that there is no evidence that the failure of the clamp or the follow-up cable caused the crash and that Green's experts' opinions amount to nothing more than speculation, and that the physical evidence in fact points to pilot error as the cause.

■ A summary judgment is "appropriate only when the facts before the court so conclusively preclude recovery by one party that judgment in favor of the other is the only possible result." *Spickler v. Greenberg*, 586 A.2d 1232, 1234 (Me.1991). In an appeal from a grant of a summary judgment, we view the evidence in the light most favorable to the party against whom the judgment has been granted, independently determining whether the record supports the conclusion that there is no genuine issue of material fact and that the prevailing party is entitled to a judgment as a matter of law. *Cushman v. Tilton*, 652 A.2d 650, 651 (Me.1995).

■ In addition to M.R.Evid. 702, which requires that expert testimony be specialized knowledge that will assist the trier of fact in understanding the evidence, an expert's opinion must also be "sufficiently tied to the facts of the case that it will aid the [factfinder] in resolving a factual dispute." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579, ——, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469, 481 (1993) (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985)). As we recently stated:

[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Bouchard v. American Orthodontics*, 661 A.2d 1143, 1144–45 (Me.1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)). This proposition applies equally to expert opinion testimony, which must "result[ ] from the application of scientific principles and physical laws to adequate facts which are in evidence. The expert's opinion may not be based upon surmise or conjecture." *Parker v. Hohman*, 250 A.2d 698, 702 (Me.1969). In other words, an expert theory may not form the basis of a favorable verdict if there are no facts in evidence on which to apply the theory to the case at hand.

■ According to Green's theory, William probably selected twenty degrees of flaps when he was preparing to land but got forty degrees because the flap indicator was never "told" by the follow-up cable, which allegedly was disconnected, to shut off at twenty degrees. Although this may be a valid hypothesis, there simply are no facts in evidence that this plane crash resulted from a failed follow-up cable. None of the parties dispute that if in fact the follow-up cable detached from the retract cable prior to William's descent to Togus Pond, thus giving him full flaps when he asked for only twenty degrees, the plane would have been uncontrollable, touching down at a high rate of descent and turning over very quickly. One of Green's experts stated that the plane would have stalled and gone into a spin. Another of her experts concluded that William had to have been in a forty-five degree bank while landing and that in fact the right wing hit the water first. According to the eyewitnesses, however, William made "what appeared to be a normal approach and landing," touching down on the surface of the pond and taxiing

on the step before "[i]t appeared like the wind caught the wing, or the plane made a turn to the left and tipped over like a tricycle." In fact, according to Green's pilot expert, if the plane were "on the step" for a period of time, that would indicate that it was *less* likely the pilot landed with a high rate of descent. Eyewitnesses stated that "the plane never stalled or entered into a spin. [Nor did] the engine rev up as if the pilot was attempting a go-around." According to Green's pilot expert, if William were presented with a situation involving a high rate of descent he would add power to help stabilize the plane.

Green's experts explain the position of the flaps at approximately twenty degrees (a normal landing position) by suggesting that once William realized his flaps went to forty degrees he moved the lever to zero (the starting point) to decrease drag and the flaps coincidentally got stuck at twenty degrees when the plane crashed. As for the flap indicator (which should not have read twenty degrees because, according to Green's theory, the follow-up cable had come loose by this time) and the flap control lever in the cockpit, Green's experts assume, for lack of any other explanation, that the NTSB investigator made a mistake when he noted their positions. There is, however, no *evidence* to support those assumptions.

There is evidence in the record, however, to support the conclusion that the accident occurred as a result of pilot error. First, William was attempting to land the plane downwind when the preferred method of landing any plane, especially a seaplane, is into the wind. A downwind landing can be dangerous because there is increased speed between the floats and the water when the plane touches down. Green's own expert explained that risk:

> [W]hen ... pilots touch down at a high speed or with a high rate of sink, the aircraft decelerates very quickly and they go forward with the stick because their body is thrown forward and that's a significant force involved when the aircraft decelerates quickly like that. And your body can go forward and your hands go forward. That drops the elevators and compounds

the situation by raising the tail which puts more of the floats into the water and eventually you can get enough drag to upset the airplane. It can happen very quickly or it can happen in slow motion.

That very scenario, in fact, most closely resembles the testimony of the eyewitnesses, who said that the right float completely submerged before the wing tip ever touched the water.

Green's metallurgist found that there was crushing damage and metal fatigue in the area where the follow-up cable failed. He was unable to state, however, how many strands were originally contained in the cable, how many of the strands showed fatigue, how many were broken, or whether the cable was overdesigned to compensate for such fatigue damage. Without such information, it is difficult to overcome the strong inference that an event such as a plane crash would cause the cable to slip out of its clamp. In fact, when Green's accident reconstructionist first hypothesized that the broken retract cable resulted in the failure of the flap system, he opined that when the retract cable broke it jerked so quickly that it pulled the follow-up cable out of its clamp. Metallurgical tests show, however, that the retract cable broke as a result of the crash, making it even more difficult to overcome the strong inference that the follow-up cable was jerked out of the clamp as the result of the plane crash.

In *Vadala v. Teledyne Indus., Inc.*, 44 F.3d 36 (1st Cir.1995), the court upheld the district court's grant of a summary judgment in favor of the manufacturer of an airplane engine. Suit was brought by the estate of the pilot killed in the crash, and its expert opined that silicone in the right engine's torsional damper (designed to reduce torsional vibration, thereby reducing strain on other engine parts) had polymerized (solidified) in flight, reducing its effectiveness and allowing a bolt to come loose, which in turn allowed the oil to drain out and the engine to fail. *Id.* at 38. The plaintiff's expert reasoned that the silicone must have polymerized during flight, not as a result of the crash and ground fire, because components near the damper in the right engine showed no damage as a result of the ground fire. *Id.* Us-

ing an analysis similar to that of the Superior Court in this case, the First Circuit affirmed, stating that because the plaintiff's expert did not know at what temperature the other components would burn, he was unable to overcome the strong inference that the silicone had polymerized in the ground fire. *Id.* at 38–39.

Because Green's experts have presented a hypothesis that is not supported by the facts in evidence, the court correctly granted a summary judgment for Cessna Aircraft Company and Maine Instrument Flight.

The entry is:

Judgment affirmed.

All concurring.