USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 ____________________

Nos. 96-2216
 97-1442

 JEAN MITCHELL, ETC.,
 Plaintiff, Appellee,

 v.

 UNITED STATES OF AMERICA,
 Defendant, Appellant.

 ____________________

No. 96-2217

 JEAN MITCHELL, ETC., ET AL.,
 Plaintiffs, Appellants,

 v.

 UNITED STATES OF AMERICA,
 Defendant, Appellee.

 ____________________

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Jack E. Tanner, Senior U.S. District Judge]

 ____________________

 Before

 Torruella, Chief Judge,

 Lynch, Circuit Judge,

and Stearns, District Judge.

 _____________________

 Mary Elizabeth Carmody, Assistant United States Attorney,
Senior Litigation Counsel, with whom Donald K. Stern, United
States Attorney, was on brief for appellant United States.
 Celine M. Boyle, with whom Robert M. Higgins, Elizabeth N.
Mulvey and Lubin & Meyer, P.C., were on brief for appellee Jean
Mitchell.

 ____________________

 March 25, 1998
 ____________________
 
 
 
 TORRUELLA, Chief Judge. Alfred J. Hassey died on June 3,
1990, from a stroke he had suffered soon after undergoing a
colonoscopy at the West Roxbury Veterans Administration Hospital. 
His daughter, Jean Mitchell, as Administratrix of his estate, filed
this wrongful death action on behalf of her mother, siblings, and
herself against his treating physicians, Drs. Carl Berg and Marc
Silver, as well as against the United States of America, the owner
of the Hospital. After dismissing the claims against the
individual defendants and holding a bench trial on the remaining
claims, the trial judge found the United States liable and awarded
damages to the decedent's widow, but not to his children. Both the
United States and the Administratrix, on behalf of the decedent's
children, cross-appealed. We affirm, with one minor clarification. 
BACKGROUND
 Mr. Hassey had been diagnosed in 1985 with atrial
fibrillation, a heart condition that often causes an increase in
the rate at which blood clots are formed. His doctors therefore
prescribed the use of Coumadin, an anticoagulant medication, in
order to help prevent the formation of blood clots. Mr. Hassey had
also suffered from colon cancer, which was treated by a
hemicolonectomy in 1983. The operation was successful and he
remained asymptomatic until the end of his life. Nevertheless, he
was required to undergo prophylactic colonoscopies approximately
every two years to detect any recurrence of the cancer. In June of
1988, Mr. Hassey underwent a colonoscopy at the Hospital. He was
taken off Coumadin three days prior to the operation, and instead
given Heparin, another anticoagulant. Coumadin therapy was
restarted the same day he was discharged from the Hospital. He
reported no ill effects from this operation.
 Two years later, Mr. Hassey was due for another
colonoscopy. Without reviewing his medical chart or medical
history, Mr. Hassey's physicians, Drs. Carl Berg and Jacques Van
Dam, instructed him to discontinue his Coumadin therapy starting
five days prior to his colonoscopy. Mr. Hassey stopped taking
Coumadin six days before the procedure, on April 17, 1990. He was
admitted to the Hospital on April 22, 1990, and on the following
day, Drs. Berg and Van Dam performed the colonoscopy. During the
operation, a suspicious polyp was located and removed by "hot"
biopsy, pursuant to which the surgeons cauterized the intestinal
wall from which the polyp had been removed. The polyp was later
determined to be pre-cancerous. Mr. Hassey was discharged on that
same day by Hospital physician Dr. Marc Silver, and instructed to
restart the Coumadin therapy after five days.
 As scheduled, Mr. Hassey restarted the Coumadin therapy
on April 28, 1990, eleven days after he had stopped taking the
medication. That was the longest period of time that he had been
off Coumadin since he was first prescribed its use. The following
day, Mr. Hassey was re-admitted to the Hospital because he was
experiencing weakness in the right side of his body and had
difficulty speaking. He suffered a massive cerebral vascular
accident: in lay terms, a stroke. One month later, Mr. Hassey died
from complications arising from the stroke.
 In her role as Administratrix of the Estate of Alfred J.
Hassey, Jean Mitchell filed the instant suit against Drs. Berg and
Silver, as well as against the United States of America, the owner
of the Hospital. The complaint, which alleged that the defendants'
negligence was the proximate cause of Mr. Hassey's death, was
brought under the Federal Tort Claims Act, 28 U.S.C. 2671-80,
and the Massachusetts wrongful death statute, Mass. Gen. Laws ch.
229, 1-2. The complaint specifically alleged that the
defendants violated their duty of care to the decedent by keeping
him off Coumadin for an excessive period of time. The complaint
further alleged that the discontinuation of the Coumadin therapy
was the proximate cause of the stroke that ultimately led to
Mr. Hassey's death. Before trial, the Administratrix and the
United States stipulated that the United States would be
substituted, in place of Drs. Silver and Berg, as the sole party
defendant. See 28 U.S.C. 2679(d)(1).
 During the bench trial, four expert witnesses testified
as to the nature and causes of Mr. Hassey's death, two on behalf of
the Administratrix, and two on behalf of the United States. 
Mr. Hassey's relatives also testified as to the emotional impact
that his death had upon them. After the trial, the district judge
found that the United States was liable to Evelyn Hassey in that
its employees "failed to use the care and skill of an average
qualified specialist taking into account the advances in their
profession in their care and treatment of Alfred Hassey." The
district judge awarded Mrs. Evelyn Hassey $300,000 for her loss,
but awarded nothing to the Administratrix or to the decedent's
children. Various post-judgment motions were submitted to and
rejected by the district court. Both the United States and the
Administratrix now appeal from the judgment of the district court.
 STANDARD OF REVIEW
 Pursuant to Fed. R. Civ. P. 52, "[i]n all actions tried
upon the facts without a jury," the trial court's "[f]indings of
fact, whether based on oral or documentary evidence, shall not be
set aside unless clearly erroneous, and due regard shall be given
to the opportunity of the trial court to judge the credibility of
the witnesses." See Sullivan v. Young Bros. & Co., Inc., 91 F.3d
242, 246-47 (1st Cir. 1996); Irving v. United States, 49 F.3d 830,
835 (1st Cir. 1995); Cumpiano v. Banco Santander Puerto Rico, 902
F.2d 148, 152 (1st Cir. 1990). Similarly, review of decisions to
admit expert testimony is for abuse of discretion. See General
Elec. Co. v. Joiner, 118 S. Ct. 512 (1997). On the other hand, the
trial court's conclusions of law are reviewed de novo. See Damonv. Sun Company, Inc., 87 F.3d 1467, 1471 (1st Cir. 1996).
 APPLICABLE LAW
 The district court's jurisdiction over this complaint was
premised on 28 U.S.C. 1346(b)(1), which provides that:
 the district courts . . . shall have
 exclusive jurisdiction of civil actions on
 claims against the United States, for
 money damages, . . . for personal injury
 or death caused by the negligent or
 wrongful act or omission of any employee
 of the Government while acting within the
 scope of his office or employment, under
 circumstances where the United States, if
 a private person, would be liable to the
 claimant in accordance with the law of the
 place where the act or omission occurred.

Thus, with some exceptions not relevant to this case, the standard
of liability applicable to a suit under the Federal Tort Claims Act
is provided by the law of the state in which the tort occurred. 
See 28 U.S.C. 1346(b)(1) and 2674. 
 Because the tort occurred in Massachusetts, that state's
law applies. The Administratrix brought suit under the
Massachusetts wrongful death statute, Mass. Gen. Laws ch. 229, 2,
which provides that "[a] person who by his negligence causes the
death of a person . . . shall be liable in damages," and also that
"[a] person shall be liable for the negligence or the willful,
wanton or reckless act of his agents or servants while engaged in
his business to the same extent and subject to the same limits as
he would be liable under this section for his own act." In
wrongful death actions based on death because of negligence, the
substantive standard of liability is provided by the Massachusetts
common law of torts, which we discuss below.
 ANALYSIS
 Both the plaintiff and the defendant have appealed from
the judgment below. The finding of liability is challenged only by
the defendant, while both plaintiff and defendant seek review of
the award of damages. We first address the appeal from the finding
of liability.
I. Liability for Medical Malpractice
 A. Application of the standard of liability
 The negligence alleged in this case is medical
malpractice. Under Massachusetts tort law, a plaintiff in a
medical malpractice suit bears the burden of proving by a
preponderance of the evidence that a physician-patient relationship
existed between the physician and the injured party, that the
physician breached his or her duty of care, and that the breach was
the proximate cause of the injury. See Blood v. Lea, 530 N.E.2d
344, 347 (Mass. 1988); see also Poyser v. United States, 602 F.
Supp. 436, 438 (D. Mass. 1984); Berardi v. Menicks, 164 N.E.2d 544,
546 (Mass. 1960). Generally, a plaintiff in a medical malpractice
action may carry his or her burden of proof on the issues of
negligence and causation only with the assistance of expert
testimony. See Harlow v. Chin, 545 N.E.2d 602, 605 (Mass. 1989)
(expert testimony generally required to prove causation); Forlanov. Hughes, 471 N.E.2d 1315, 1319 (Mass. 1984) (expert medical
opinion generally required to prove breach of duty of care). A
physician is held to the standard of care and skill of the average
practitioner of the medical specialty in question, taking into
account the advances in the profession. See Poyser, 602 F. Supp.
at 438-39 (citing Brune v. Belinkoff, 235 N.E.2d 793, 798 (Mass.
1968)). Proof of the element of causation, which is an issue of
fact, depends on whether it is more probable than not that the
death was the result of the physician's negligence. See Harlow,
545 N.E.2d at 605. Here it must be emphasized that: 
 [w]hile the plaintiff is not bound to
 exclude every other possibility of cause
 for his injury except that of the
 negligence of the defendant, he is
 required to show by evidence a greater
 likelihood that it came from an act of
 negligence for which the defendant is
 responsible than from a cause for which
 the defendant is not liable.

Forlano, 471 N.E.2d at 1319 (citations omitted).
 The defendant argues that the district court erred as a
matter of law by evaluating its actions under a strict liability
rather than negligence standard of care. The United States points
to certain isolated statements made by the trial judge during trial
that, it claims, establish that he applied a strict liability
standard of care. We disagree. The comments in question were
vague and do not necessarily establish that the judge applied the
wrong standard of care. Indeed, in his findings of fact and
conclusions of law, the trial judge relied on expert medical
opinion in determining that Mr. Hassey's treating physicians 
provided negligent medical care, and that their negligence was a
proximate cause of his death.
 B. Admission of statistical evidence
 The United States complains that the district court erred
in refusing to admit or consider the testimony of one of its
medical experts on the statistics concerning the risk of stroke
versus the risk of bleeding. We reject this assignment of error. 
The trial judge ultimately did not refuse to admit this testimony. 
Although he did, at first, resist the admission of the statistical
evidence, on the following day the trial judge proceeded to hear
the testimony in question. The defendant's invitation to reverse
the judgment below is thus based on its speculative conclusion that
the absence of a discussion of statistical evidence in the judge's
findings of fact "clearly indicate[s]" that he did not consider
this evidence because he was biased against its use. We decline
the invitation to engage in such speculation.
 C. Admission of expert testimony
 The United States also claims that the judgment below
must be reversed insofar as it rested on the plaintiff's expert
testimony, which it contends should have been excluded by the
district court under Daubert v. Merrell Dow Chemicals, 509 U.S. 579
(1993). We reject this argument, too. The baseline for
approaching questions of the admissibility of evidence is Fed. R.
Evid. 402, which provides that "[a]ll relevant evidence is
admissible," except as otherwise provided by the Constitution,
laws, or rules of the court. Evidence is relevant if it has "any
tendency to make the existence of any fact that is of consequence
to the determination of the action more probable or less probable
than it would be without the evidence." Fed. R. Evid. 401. As the
Supreme Court noted, "the Rule's basic standard of relevance thus
is a liberal one." Daubert, 509 U.S. at 587. 
 With regard to expert testimony, the rules of evidence
specifically provide:
 If scientific, technical, or other
 specialized knowledge will assist the
 trier of fact to understand the evidence
 or to determine a fact in issue, a witness
 qualified as an expert by knowledge,
 skill, experience, training, or education,
 may testify thereto in the form of an
 opinion or otherwise.

Fed. R. Evid. 702. In Daubert, which interpreted Rule 702, the
Supreme Court held that when a trial judge is faced with the
decision to accept or reject a proffer of expert scientific
testimony, the judge must determine:
 whether the expert is proposing to testify
 to (1) scientific knowledge that (2) will
 assist the trier of fact to understand or
 determine a fact in issue. This entails a
 preliminary assessment of whether the
 reasoning or methodology underlying the
 testimony is scientifically valid and of
 whether that reasoning and methodology
 properly can be applied to the facts in
 issue.

Daubert, 509 U.S. at 592; see also Vadala v. Teledyne Indus., Inc.,
44 F.3d 36, 39 (1st Cir. 1995). Of course, there is a third,
implicit consideration: "[t]he trial court first must determine
whether the putative expert is qualified by knowledge, skill,
experience, training, or education." See Ed Peters Jewelry Co.,
Inc. v. C & J Jewelry Co., Inc., 124 F.3d 252, 259 (1st Cir. 1997)
(quoting Bogosian v. Mercedes Benz of N. Am., Inc., 104 F.3d 472,
476 (1st Cir. 1997)); cf. Rohde v. Lawrence General Hosp., 614
N.E.2d 686, 688 (Mass. App. Ct. 1993). Finally, we note that a
district court enjoys substantial discretion to decide whether to
admit or exclude relevant expert testimony. See General Elec. Co.,
118 S. Ct. 512; Bogosian, 104 F.3d at 479.
 There is no dispute over the professional qualifications
of the plaintiff's expert witnesses, Drs. Barry Singer and Howard
Adler. The first issue is thus whether the testimony offered by
the plaintiff's expert witnesses was relevant - i.e., whether the
testimony could "assist the trier of fact to understand or
determine a fact in issue." Daubert, 509 U.S. at 592. The issue
before the judge was whether Mr. Hassey's treating physicians acted
according to the standard of care and skill of the average member
of a practitioner of their medical specialty, taking into account
the advances in the profession, when they adjusted Mr. Hassey's
anticoagulant levels before and after the colonoscopy. 
 The experts for both parties testified that during a
colonoscopy, if a polyp is detected, the surgeon normally performs
a polypectomy (a type of biopsy), cutting off the polyp for
examination. The experts also agreed that anticoagulants can
increase the risk of bleeding from wounds and retard their healing. 
Thus, to allow the clotting factors of a colonoscopy patient on
Coumadin therapy to return to normal so as to permit adequate
healing of his or her intestinal tissue, such a patient is required
to be off Coumadin for a period of time. The longer the period
during which the patient is not taking Coumadin, however, the
greater the risk that he or she will suffer a stroke. The proper
length of time to keep a colonoscopy patient off Coumadin therefore
depends on a balancing between the risk of bleeding and the risk of
stroke.
 The testimony offered by Drs. Singer and Adler was
certainly relevant to the issue at trial. Dr. Singer, an internist
with specialties in hematology and oncology, testified that he had
substantial experience in the use of Coumadin, and that he had
performed several colonoscopies earlier in his career. He also
testified that he had been consulted over 100 times by
gastroenterologists seeking advice on the proper treatment for
patients on anticoagulant medication who were scheduled to undergo
colonoscopies. Similarly, Dr. Adler, an internist with a specialty
in gastroenterology, testified that he has performed at least
twenty thousand colonoscopies, as well as numerous biopsies,
including polypectomies. He further testified that he was familiar
with the risk of bleeding associated with these procedures, and
with the standard of care expected of gastroenterologists in
adjusting anticoagulant levels for patients undergoing
colonoscopies. We find no error in the district judge's
determination that the testimony provided by both of these experts
would assist him in understanding and determining the facts at
issue in this case.
 Nevertheless, the United States challenges the
admissibility of the opinions of these experts on the basis that
such testimony was not reliable. With regard to Dr. Singer, the
defendant claims that he was not qualified to testify about the
defendants' treatment of Mr. Hassey because he is not a specialist
in gastroenterology, and that he could not provide a reliable
opinion on the risk of stroke as compared to the risk of bleed
because he admitted during trial that he had no direct knowledge of
the risk of bleeding from a colonoscopy during which a polypectomy
was performed. 
 We disagree. First of all, the Government is simply
wrong to suggest that Dr. Singer was not qualified to testify
merely because he was not a gastroenterologist. "The fact that the
physician is not a specialist in the field in which he is giving
his opinion affects not the admissibility of his opinion but the
weight the jury may place on it." Payton v. Abbott Labs, 780 F.2d
147, 155 (1st Cir. 1985); cf. Letch v. Daniels, 514 N.E.2d 675, 677
(Mass. 1987) ("A medical expert need not be a specialist in the
area concerned nor be practicing in the same field as the
defendant.")
 Moreover, the specific testimony offered by Dr. Singer
was within his area of expertise. He testified that cardiologists
and hematologists are very much aware of the relative benefits and
risks arising from the use of anticoagulants such as Coumadin, and
the effects of their discontinuation. Dr. Singer explained that
when a patient who has been taking Coumadin for several years is
taken off the medication, that patient will enter a
hypercoagulative state in which the rate at which clots are
produced is greatly increased. Dr. Singer also testified that
Coumadin takes about three days after it is restarted to have any
effect on clot formation. Furthermore, Dr. Singer noted that he
was familiar with the standard of care for gastroenterologists
because he had been consulted by gastroenterologists on more than
100 occasions on the appropriate treatment for colonoscopy patients
who are on anticoagulant therapy.
 The United States makes much of the fact that Dr. Singer
admitted that he did not know how the risk of bleeding would vary
depending on whether a hot or cold biopsy had been performed. As
other witnesses explained, biopsies can be "cold" or "hot," the
main difference being that during hot biopsies, the flesh is
cauterized afterwards to minimize bleeding immediately after the
operation. Patients undergoing hot biopsies, however, are at risk
for delayed bleeding between seven and fourteen days after the
operation, when the scab that formed over the cauterized tissue
falls away. The defendant argues that Dr. Singer's admission
establishes that his opinion -- that the risk of bleeding was less
than the risk of stroke -- was personal speculation unsupported by
any knowledge, training or experience and thus lacked a reliable
factual foundation.
 The inference is unwarranted. A review of the trial
transcript indicates that Dr. Singer merely stated that he could
not quantify the risk of bleeding from a biopsy. In the context of
the question, "risk" referred to the likelihood of bleeding, not
its severity. Dr. Singer also testified, however, that he knew
that the risk of bleeding was generally lower than the risk of
stroke in terms of severity because only a tiny fraction of
patients undergoing biopsies die as a result of these procedures. 
In his opinion, the danger posed by keeping a patient off Coumadin
for 11 days, with the attendant increase in the rate of clot
production, is a greatly increased risk that the patient will
suffer a stroke, which often leads to brain damage and death. It
was not necessary for Dr. Singer to be able to specify in numerical
terms the likelihood that a biopsy patient would bleed after an
operation in order to support his opinion that the risk that a
patient would suffer a stroke clearly exceeded the danger posed by
the possibility of post-operative bleeding, and thus that
anticoagulants should be restarted sooner than the defendants did
with Mr. Hassey. 
 The United States also objects to Dr. Adler's testimony,
which it also claims was unreliable and therefore should have been
excluded under Daubert. Dr. Adler testified that he would have
restarted anticoagulant therapy several days before Mr. Hassey's
physicians did. The defendant's main complaint is that Dr. Adler
rendered his opinion without first reading the transcripts of the
physicians' depositions or certain parts of the medical record,
including the post-operative report prepared by Dr. Berg. This
complaint would be valid only if the parts of the record that
Dr. Adler did not read contained information that was unavailable
in the parts that he did read. In fact, Dr. Adler's evaluation of
the pathologist's report allowed him to study the nature of the
incisions made by the defendants in the course of the biopsy. This
report is at least as reliable a basis for his opinion as the
report prepared by the treating physicians.
 The defendant also argues that there was a discrepancy
between the treatment that Drs. Adler and Singer would have
recommended for Mr. Hassey. We fail to see how this discrepancy
should render Dr. Adler's testimony inadmissible. To the
contrary, although couched in Daubert terms, this argument is a
thinly veiled challenge to the district court's determination of
the credibility and soundness of Dr. Adler's opinion. "The fact
that defendant was able to undercut some of the research basis for
the doctors' opinions does not affect the admissibility of those
opinions. If the factual underpinnings of their opinions were in
fact weak, that was a matter affecting the weight and credibility
of their testimony." Payton, 780 F.2d at 156 (citing Coleman v.
DeMinico, 730 F.2d 42, 47 (1st Cir. 1984)); cf. Baker v. Commercial
Union Ins. Co., 416 N.E.2d 187, 190 (1981) ("The question whether
the basis of the doctor's opinion is sound goes to the weight of
the evidence, not its admissibility.") The finder of fact's
determinations of credibility, and of the weight of the evidence in
general, are not disturbed on appeal except for clear error. A
finding of fact is clearly erroneous when the reviewing court is
left with the definite and firm conviction that a mistake has been
made. See Anderson v. City of Bessemer City, 470 U.S. 564, 573
(1985). Thus, a credibility determination is clearly erroneous
only when it is based on testimony that was inherently implausible,
internally inconsistent, or critically impeached. See Keller v.
United States, 38 F.3d 16, 25 (1st Cir. 1994). 
 Dr. Adler's testimony was admissible and the court was
entitled to rely on it: it was plainly plausible, internally
consistent (it was partly inconsistent with Dr. Singer's testimony,
not with his own), and was not critically impeached. More
generally, the parties presented conflicting expert testimony from
medical specialists on the issue of whether the defendants'
decision to keep Mr. Hassey off Coumadin for more than ten days was
a breach of the applicable standard of medical care and the
proximate cause of his death. After reviewing the record below,
including the transcripts of the trial, we find the evidence before
the district judge to be sufficient to permit him to find that
Drs. Berg, Van Dam, and Silver were negligent in their treatment of
Mr. Hassey, and that their negligence was a proximate cause of his
death.
 D. Denial of the Motion for New Trial
 The United States argues that a new trial was required
because the plaintiff failed to provide any credible evidence that
the risk of stroke was greater than the risk of bleeding, or that
Mr. Hassey would not have had a stroke had the Coumadin therapy
been restarted earlier. We disagree, for reasons already amply
explored above. E. Denial of the Motion for Mistrial
 Plaintiff's counsel filed a motion requesting certain
conclusions of law, including a suggested award of damages. The
United States argues that since the claim was for pain, suffering,
and related subjective damages, the suggestion was a direct
violation of Massachusetts law, which allegedly prohibits counsel
from requesting that a finder of fact enter a specific subjective
amount for unliquidated damage claims. 
 The request for mistrial was properly denied. First, a
claim under section 2 of the wrongful death statute includes
compensation not only for unliquidated damage claims, but also for
liquidated damage claims, such as loss of income, which are not
subject to the alleged prohibition. Furthermore, the
"prohibition" on suggestions as to the amount of awards for
unliquidated damage claims is not a true prohibition, but rather
only a strong recommendation. See, e.g., Goldstein v. Gontarz, 309
N.E.2d 196, 207 n.15 (1974) ("We agree with recent suggestions that
in most cases where the damages are unliquidated and rest with the
jury, the trial judge would be better advised to withhold the ad
damnum from the jury than to read the figure and then attempt to
negate its effect with an instruction.") (emphasis added). 
Moreover, a review of the relevant case law indicates this rule has
only been applied to jury trials. In addition to the lack of
precedent, we see no reason why Massachusetts would choose to
extend the rule to bench trials, particularly since judges, unlike
juries, are expected to be able to avoid being unduly influenced by
counsel. Here, not only was the trial a bench trial, but it was
the trial judge himself who requested an estimate of the amount of
damages that should be awarded.
 F. Denial of the Motion for Reconsideration
 In September of 1996, an article was published in the
Journal of Gastrointestinal Endoscopy which contained the results
of a nationwide survey of gastroenterologists to determine the
average standard of practice with respect to the management of
antiplatelet agents and anticoagulants, including Coumadin, when
performing diagnostic and therapeutic endoscopic procedures,
including colonoscopies. See C.E. Angueira, et al.,
Gastrointestinal Endoscopy in Patients Taking Antiplatelet Agents
and Anticoagulants: Survey of ASGE Members, 44 J. of
Gastrointestinal Endoscopy, No. 3, at 309 (1996). The following
month, the Government filed a motion under Fed. R. Civ. P. 60(b)(2)
for relief from judgment, claiming that the article constituted
"new evidence" that directly contradicted the district court's
findings of fact and conclusions of law. The district court denied
the motion, and the United States now argues that the denial was an
abuse of discretion.
 A motion under Rule 60(b)(2) for "new trial on the ground
of newly discovered evidence requires proof of the following
elements:" 
 (1) The evidence has been discovered since the trial;
 (2) The evidence could not by due diligence have been
 discovered earlier by the movant[;]
 (3) The evidence is not merely cumulative or
 impeaching; and
 (4) The evidence is of such nature that it would
 probably change the result if a new trial is
 granted.

Raymond v. Raymond Corp., 938 F.2d 1518, 1527 (1st Cir. 1991)
(quoting Nickerson v. G.D. Searle & Co., 900 F.2d 412, 417 (1st
Cir. 1990)). A district court's ruling on a motion under Rule
60(b) will only be overturned for an abuse of discretion. SeeRaymond, 938 F.2d at 1527; Nickerson, 900 F.2d at 416; Duffy v.
Clippinger, 857 F.2d 877, 879 (1st Cir. 1988).
 There are two problems with the defendant's argument. 
The first is that it is by no means clear that this article
constitutes "newly discovered evidence" for purposes of Fed. R.
Civ. P. 60(b). Although the trial was held on May 1-3, 1996,
approximately four months before the article was published, an
abstract of the article had been available since 1993. A more
diligent effort to research the relevant medical literature by the
defendant should have produced the abstract. 
 The second and more important problem is that the
evidence would not be likely to change the result of the trial. 
The United States has retained as experts some of the authors of
the article, one of whom would testify that, based on the survey,
he thought that 60% of the gastroenterologists in the United States
would have restarted Coumadin after a colonoscopy within 7 days or
less. The proposed expert would also testify that there are no
published guidelines at present that would assist endoscopists in
managing patients on anticoagulant therapy during the period of
time following a colonoscopy, and that most endoscopists are
therefore using their own judgment or criteria in managing such
patients. 
 This evidence would not have required the trial judge to
reach a different result. As a general matter, the article, and
the expert's testimony, are based on a survey to which only 38.5%
of ASGE members responded, a response rate which was described by
the authors of the article as "less than ideal." Moreover, the
responses were based on generalized questions, such as the length
of time the gastroenterologists would wait before restarting
Coumadin after a therapeutic colonoscopy (i.e., one during which a
biopsy or polypectomy was performed) in patients suffering from
conditions such as atrial fibrillation. The answers to these
questions are not definitive because they did not take into
consideration the particulars of a patient's medical history, even
though the experts testifying before the trial judge agreed that
such particulars are indispensable in determining the proper
treatment to be followed. As for the proposed testimony regarding
the lack of published guidelines, the fact remains that
gastroenterologists cannot close their eyes to the standard of care
appropriate to other specialties when performing procedures within
their own that impact upon other specialties. 
 The trial judge heard testimony from specialists in
hematology and gastroenterology who indicated that Mr. Hassey
should not have been kept off Coumadin as long as he was, and
explained in detail why they thought so. We think it improbable
that the proposed evidence would have resulted in a different
outcome.
II. Distribution of the Damages
 Both the Administratrix and the Government appeal from
the district court's award of damages. The Administratrix argues
that the district court erred as a matter of both law and fact in
denying Mr. Hassey's adult children's claims for compensation under
the Massachusetts wrongful death statute. The United States, in
turn, argues that the district court did not err in not awarding
damages to the decedent's children because they are adults who were
no longer financially dependent upon their father and are therefore
not entitled to recover under the statute. The Government also
argues, however, that insofar as the district court awarded damages
to Mr. Hassey's widow, rather than to the Administratrix, the
district court acted without subject matter jurisdiction. 
 Section 2 of the wrongful death statute provides, in
pertinent part, that:
 [a] person who . . . by his negligence
 causes the death of a person . . . shall
 be liable in damages in the amount of . .
 . the fair monetary value of the decedent
 to the persons entitled to receive the
 damages recovered, as provided in section
 [1], including but not limited to
 compensation for the loss of the
 reasonably expected net income, services,
 protection, care, assistance, society,
 companionship, comfort, guidance, counsel,
 and advice of the decedent to the persons
 entitled to the damages recovered.

Mass. Gen. Laws ch. 229, 2. Section 2 further provides that "[a]
person shall be liable for the negligence . . . of his agents or
servants while engaged in his business to the same extent and
subject to the same limits as he would be liable under this section
for his own act." Section 1, which independently provides for a
type of premises liability, also specifies that:
 [i]f the deceased shall have been survived
 by a wife or husband and by more than one
 child surviving either in person or by
 issue, then one third to the use of such
 surviving spouse and two thirds to the use
 of such surviving children or their issue
 by right of representation.

Mass. Gen. Laws ch. 229, 1(3).
 "The plain language of the statute permits recovery for
those losses akin to loss of consortium." Schultz v. Grogean, 548
N.E.2d 180, 181 (Mass. 1990). However, "the first clause of
section 2 limits recovery to a class of persons. It provides for
recovery of compensatory damages by 'the persons entitled to
receive the damages recovered' and limits the class to those
persons 'as provided in section [1].'" See Burt v. Meyer, 508
N.E.2d 598, 602 (Mass. 1987) (adopting interpretation proposed in
Guy v. Johnson, 448 N.E.2d 1142, 1144-45 (Mass. App. Ct. 1983)). 
If the class of presumptive takers, as defined in section 1, is to
recover under section 2, they must then prove that the decedent had
monetary value to them. See Burt, 508 N.E.2d at 602; Guy, 448
N.E.2d at 1144. 
 We find no support in Massachusetts statutory or case law
for the United States' contention that adult children must be
financially dependent upon their decedent in order to be entitled
to recover damages under section 2 of the wrongful death statute. 
To the contrary, the plain language of section 1(3) of the wrongful
death statute makes the surviving spouse and children presumptive
takers without mentioning any requirement that they be dependent. 
Moreover, the Supreme Judicial Court of Massachusetts has approved
the award of damages to relatives who were not financially
dependent upon the decedent. See Santos v. Lumbermen's Mut. Cas.
Co., 556 N.E.2d 983, 988 n.10 (Mass. 1990) (parents of deceased
adult unmarried child may recover damages under section 2 as "next
of kin" for purposes of section 1); Schultz, 548 N.E.2d at 182
(same); cf. Bratcher v. Galusha, 627 N.E.2d 908 (Mass. 1994)
(father of deceased adult married child was not entitled to recover
damages under section 2 because, under section 1, the surviving
spouse was the only presumptive taker); Norman v. Massachusetts Bay
Transp. Auth., 529 N.E.2d 139, 142 (Mass. 1988) (noting, in dicta,
that if child had died rather than merely been injured, parents
would have been entitled to recover under section 2 for loss of
consortium); Guy, 448 N.E.2d at 1145 (father of deceased minor
child was presumptive taker under section 1). Similarly, at least
one federal district court has explicitly decided that adult
children are presumptive takers in a claim under section 2 for the
death of their parent. See Knowlton v. Spillane, 137 F.R.D. 196,
197 (D. Mass. 1991); cf. Poyser v. United States, 602 F. Supp. 436
(D. Mass. 1984) (mother of a minor daughter was a presumed taker
under section 1(4)). 
 Indeed, a situation identical to this case seems to have
arisen in Burt v. Meyer, 508 N.E.2d 598 (Mass. 1987). After the
trial of the wrongful death action brought by the executrix of the
estate of the decedent, the jury awarded, inter alia, $174,000 in
compensatory damages for the benefit of the widow, and $20,000 for
the benefit of each of the decedent's four children by a previous
marriage. On appeal, the adult children of the decedent argued
that the distribution of an award under section 2 was subject to
the constraints of section 1, which they claimed entitled them to
two thirds of the entire award. The Supreme Judicial Court
rejected this argument, holding that a presumptive taker is
entitled to nothing beyond what it is proven at trial he or she
lost as a result of the decedent's death. More importantly,
however, the Court affirmed the original award to the children. 
Although the Court's decision does not specifically state that the
children were non-dependent adults, that fact could fairly be
inferred.
 Nevertheless, we affirm the trial judge's award of
damages. The trial judge heard testimony from all of Mr. Hassey's
children as to their relationship with him and the effect that his
death has had upon them. The fact that the judge did so even after
the Government had vigorously argued that the children were not
entitled to recover under section 2 indicates that the judge
correctly understood that Mr. Hassey's children were presumptive
takers under section 1.
 After hearing the children's testimony, the trial judge
still chose to award them nothing. Upon reviewing the relevant
portion of the trial transcript, we find that it would not have
been error for the trial judge to find that the loss suffered by
the decedent's children did not exceed such grief, anguish, and
bereavement as one may normally expect upon the death of a parent. 
As the Administratrix admits in her brief, recovery under section
2 "was not intended to include components of 'grief, anguish and
bereavement of the survivors.'" MacCuish v. Volkswagenwerk, A.G.,
494 N.E.2d 390, 398 (Mass. App. Ct. 1986).
 Finally, although the United States is technically
correct in pointing out that the trial judge should have awarded
damages to the Administratrix, rather than to Mrs. Hassey, the
error is merely one of form. Pursuant to section 2 of the statute,
"[d]amages under this section shall be recovered in an action of
tort by the executor or administrator of the deceased." However,
"the procedural framework of the wrongful death statute, through
which an administrator brings an action on behalf of the next of
kin, [does not make] each person who has suffered consortium-like
damages any less injured. To hold otherwise would elevate form
over substance, looking less at the question, 'who is injured,' and
more at the question, 'who is technically bringing the suit.'" 
Santos, 556 N.E.2d at 988.
 The Supreme Judicial Court has therefore approved of
verdicts awarding different amounts to each person recovering under
section 2. See Burt, 508 N.E.2d at 602 ($174,000 for widow and
$20,000 for each child); Guy, 448 N.E.2d at 1145 ($37,786.06 for
mother and $103.41 for father). Indeed, in Guy, the Court approved
of the decision of the probate judge to distribute the award of
compensatory damages obtained in a wrongful death suit in
accordance with the jury verdict. 
 The trial judge in this case, therefore, did not err in
determining the specific amount that Mrs. Evelyn Hassey was
entitled to receive. Instead, the only error he committed was to
enter judgment in her name, rather than in the name of the
Administratrix. The error is easily corrected. We thus resolve to
modify the judgment to clarify that the nominal recipient of the
award is the Administratrix of the Estate of Alfred J. Hassey, for
the benefit of Evelyn Hassey. Of course, when the assets of the
estate are distributed, the probate judge will distribute the
compensatory damages awarded in this suit in accordance with the
trial judge's findings.
 For the foregoing reasons, we affirm the judgment entered
by the district court, as modified by this opinion.