STATE OF MAINE                                    SUPERIOR COURT
    )                                                 CIVIL ACTION
YORK, ss.                                        DOCKET NO. CV-00-137

RIPLEY ROAD ASSOCIATES, LLC,
et al.,

                    Plaintiffs

        v.                              DECISION AND ORDER


TOWN OF KITTERY,

                    Defendant

        Following hearing the Defendant's Motion for Summary Judgment is

Granted, in part, and the Plaintiffs' Motion for Summary Judgment is Denied, all as

follows.

FACTUAL BACKGROUND

        On October 12, 1999, Plaintiffs Ripley Road Associates ("Ripley"),

Weathervane Seafoods ("Weathervane") and Terry and Janet Gagner[1] together

requested the Town of Kittery to change the zoning of their properties from

residential to commercial use in order to extend the U.S. Route 1 Commercial Zone

in Kittery (the "rezoning request"). **Complaint** ¶ 8. The Plaintiffs' parcel of land

consists of a peninsula of land approximately 24 acres ("the parcel") abutting the

commercial zone on the easterly side of U.S. Route 1. DSMF ¶ 31. This parcel is

entirely within the rural residential zone under Kittery's Land Use and

Development Code Zoning Ordinance. DSMF ¶ 31. The parcel is currently

_____

[1] Terry Gagner is the President of Plaintiff Weathervane Seafoods. DSMF ¶ 50.

occupied by two residential homes. One home is the residence of Plaintiffs Terry and Janet Gagner and the other home is the residence of Terry Gagner's father, Raymond Gagner. DSMF ¶ 33. The parcel is located in what is termed as a "growth area" under the Town's current Comprehensive Plan adopted by the Town Council on September 25, 1989. DSMF ¶ 32. Under Plaintiffs' proposed rezoning, approximately nine acres would become commercial and about fifteen acres would become resource protection. DSMF ¶ 31. The effect of the proposed rezoning amendment, according to the testimony of Plaintiff Terry Gagner, is that it would allow Ripley Road Associates to utilize approximately six acres of its parcel for commercial development while maintaining a shoreland setback resource protection area. DSMF ¶ 31.

Pursuant to the Town's Land Use and Development Code Zoning Ordinance (the "Ordinance"), the rezoning request was the subject of public hearings before the Town's Planning Board. The result of those hearings was a recommendation from the Planning Board to the legislative body of the Town, the Town Council, (the "Council"), that the rezoning request be adopted. DSMF ¶ 38; Complaint ¶ 9. On March 13, 2000, the Council voted to approve the rezoning request and created the Spruce Creek Commercial Overlay District and a Resource Protection Overlay District. DSMF ¶ 42; PSMF ¶ 2; Complaint ¶ 10.

Following the Council's adoption of the rezoning request, a group of Kittery residents circulated a series of petitions seeking an election to overrule the action of the Council. Complaint ¶ 11. The petition stated that it was circulated pursuant to

2

Article XI, Section 11.03 of the Town Charter. **Id**. Pursuant to Section 11.03, if a petition signed by not less than 10% of Kittery's qualified voters is filed with the town clerk within thirty days after the enactment of any ordinance, the Town Council is to call a public hearing and a special town election for the purpose of submitting to a referendum vote the question of repealing the ordinance.

Susan Emery was one of the organizers of the petition. PSMF ¶ 6. She testified that the individuals gathering signatures on the petition would have those signing the petition read the information on the petition before they signed.[2] DSMF ¶ 29. Each petition page referenced that the petition was being signed by "the undersigned registered voters of Kittery, Maine." DSMF ¶ 47. The petition gatherers were told to inquire whether a prospective signatory was a qualified voter in the Town. DSMF ¶ 29. When asked whether petition circulators verified whether the signer was a qualified voter in Kittery, Emery answered: "well, petitioners would tend to ask that question because otherwise the signatures would be thrown out if the person was not a qualified voter. And at times people think they are qualified voters and they're not. So always there would be some signatures thrown out." PSMF ¶ 7.

Emery testified that to her knowledge, the Kittery Charter requires the substance of the petition language to be listed on the petition document circulated for signatures. PSMF ¶ 9. She also testified that another petition organizer, Gay

---

2 Plaintiffs deny that all of the individuals gathering signatures for the petition asked people to read the information on the petition before they signed it. Plaintiffs' Reply SMF 29.

3

Lakin, met with the Kittery Town Manager to ensure that the petition form met all of the Town's requirements for petitions to overrule Town Council action. **Id.**

The petition included spaces for each signer to write his or her signature, printed name and residence. It did not include a space to list the signer's municipality of residence. PSMF ¶ 8, DSMF ¶ 47. None of the individual pages of the petition included any verification, certification, or affidavit made under oath by the circulator of the petition stating that to the best of his or her knowledge, all the signatures were gathered from qualified voters in Kittery. **Id.**

On March 27, 2000, the petition was submitted to and received by the Town Clerk's office. The Town Clerk referred the petition to the Registrar of Voters. PSMF ¶ 10. There were 6,410 qualified voters in the Town as of March 27, 2000. PSMF ¶ 11, DSMF ¶ 49. The 10% requirement of Section 11.03 could be met with 641 valid signatures. The Registrar of Voters certified that the overrule petition contained 1,021 qualified voter signatures. PSMF ¶ 11; DSMF 20.

On April 19, 2000, the Kittery Town Council held a public hearing on the petition. PSMF ¶ 12. Prior to the April 19 public hearing, the Plaintiffs' attorney, F. Paul Frinsko, wrote a letter dated April 14, 2000 to the Chair of the Kittery Town Council on Plaintiffs' behalf challenging the validity of the petition. PSMF ¶ 13. Plaintiff Terry Gagner attended the public hearing and challenged the validity of the petition. **Id.** The Council Chair, Mark Sousa, stated that he had reviewed the petition and that "they did have a printed name, and the ones without the printed names were crossed off. He said the street address was also there and if it wasn't it

4

was crossed off." **Id.** The Council voted to submit the petition to the Town voters at the municipal election on June 13, 2000. **PSMF ¶ 12.**

At the polling place on June 13, there were two or three petition tables involving other issues located outside of the guardrails in the passageway between the location where the completed ballots were placed in the voting machine and the exit to the polling place.[3] **DSMF ¶ 3; Plaintiffs' Reply SMF ¶ 3.** There were two referendum questions on the ballot relating to commercial development (questions 1 and 2). **DSMF ¶ 2; Plaintiffs' Reply SMF ¶ 2.** Question 1 was the overrule petition at issue. **Id.** The only other item on the ballot was an election for a new Kittery Town Councillor (question 3). **Plaintiffs' Opposing SMF ¶ 8.**

At approximately 8:00 a.m. on June 13, it came to the attention of Elaine Plante, the Election Warden for the Town of Kittery, that an individual working at the petition table located closest to the voting machine was speaking loudly. **DSMF ¶ 4.** She advised this individual to keep his voice down. **Id.** About an hour later, Plante signaled to this same individual to keep his voice down.[4] **Id.** A third occasion occurred at approximately 10:30 a.m. when Plante could hear this same individual state to a voter who was exiting and passing by the petition table that if that person had voted a certain way on question # 2 (Plante was not certain which

---

[3] The Election Warden, Elaine Plante, testified that the building used on June 13 was very small and it was not suitable to have petition tables set up in the polling place. However, Ms. Plante accommodated the petition tables inside the polling place because if the tables were placed outside the polling place it would have been difficult for her to supervise. Plante Depo. p. 17-19.

[4] At this time, Plante testified that the individual was speaking loudly on the issue of the "mall sprawl." Plante Depo. p. 27.

5

way the individual was referring to), that the person had wasted their vote. **Id.** Plante again advised this individual that if he did not keep his voice down, she would "shut him down." **Id.** After this warning, Plante did not hear any more loud noises from this individual. **Id.** None of the individuals working at the polling place complained to Plante about any noise or other problems with the individuals at the petition tables. **DSMF ¶ 10; Plaintiffs' Reply SMF ¶ 10.**

Plaintiff Terry Gagner testified that on election day, he saw a sign posted behind a petitioners' table with a slogan that conveyed the message "stop mall sprawl." **Plaintiff's Reply SMF ¶ 5.** Mark Sousa testified that at approximately 11:30 a.m. he saw a cardboard sign, approximately one foot by one and half feet, hanging on the wall behind one of the petitioners tables. **Plaintiffs' Opposing SMF ¶ 2.** The sign was handwritten and said (Sousa does not remember the exact wording): "if you voted against the Weathervane Rezone[5], please sign here." **Id.** Sousa did not think that the sign was appropriate for posting in the voting area, so he approached Bruce Lakin, who was sitting at the petitioners' table to question him about the sign. **Plaintiffs' Opposing SMF ¶ 3.** Sousa also saw Susan Emery at the petitioners' table at that time. **Id. Id.** Mr. Lakin denies that there was a cardboard sign hanging behind the petition table where he was working. **Defendant's Reply SMF ¶ 3.**

Sousa also testified that after he exited the voting area, at least two people mentioned to him that there was a sign concerning the Weathervane Rezone

---

[5] The "Weathervane Rezone" was the term commonly used in Kittery at the time to refer to the Council's March 13, 2000 decision to rezone the property. PSMF ¶ 1.

hanging in the area of the petitioners' table. On both of these occasions, Sousa alleges that went back into the voting area to ask Elaine Plante or Maryann Place, the Town Clerk, to ask Mr. Lakin to remove the sign. **Plaintiffs' Opposing SMF ¶ 4.**

Shortly thereafter, Sousa testified that he saw Duncan McEachern, the Town's attorney, and asked his opinion of the sign. **Plaintiffs' Opposing SMF ¶ 5.** McEachern allegedly entered the building to view the sign and when he came back he told Sousa that he had told Lakin that the sign was illegal. **Id.** Sousa testified that Lakin then came out with the sign in his hand and threw the sign in his truck. **Id.** Attorney McEachern denies seeing any signs or having any conversation with Sousa or Lakin regarding the legality of signs at the petitioners' table. **Defendant's Reply SMF ¶ 5.**

Between 4:00 p.m. and 5:00 p.m. on election day, voter Robert Wyman went to vote in the election. **Plaintiffs' Opposing SMF ¶ 6.** Wyman testified that he recognized Bruce Lakin sitting at the petitioners table. **Plaintiffs' Opposing SMF ¶ 8.** After Wyman voted and turned in his ballot, he proceeded past the petitioners' table to exit the building. **Plaintiffs' Opposing SMF ¶ 9, 10.** At this point, Wyman testified that he saw a sign propped up on the petitioners' table that said (Wyman does not remember the exact wording): "If you voted 'No' stop here and sign." **Plaintiffs' Opposing SMF ¶ 10.** Wyman testified that he felt that the sign was intimidating, because it implied that if a person did not stop to sign the petition, the person must have voted "yes" on the ballot question related to commercial development in Kittery. **Plaintiffs' Opposing SMF ¶ 11.**

7

Elaine Plante testified that any signs having anything to do with voter decisions on issues being voted on were located across the street and more than 250 feet from the polling place. DSMF ¶ 5. However, Plante did testify that someone approached her about a sign as she was leaving for dinner, and that the person mentioned that the Town's attorney had seen the sign. **Plaintiffs' Reply SMF ¶ 6.** Plante testified that this confused her because she hadn't seen any signs. **Plante Depo. p. 33-34.** She testified that she was not aware of any signs visible inside the voting place that related in any way to how one should vote on the referendum question in issue. DSMF ¶ 6. Other than small signs on the petitioners' tables announcing the nature of the petition (which Plante did not stop to read), Plante testified that there were no other signs in the interior of the polling place that in her opinion could influence a voter's decision on how to cast their ballot. DSMF ¶ 8; **Plaintiffs' Reply SMF ¶ 7.** Neither Erna Breton nor Susan Emery, both working at the election on June 13, noticed any signs at the petition tables. DSMF ¶ 23, 25. Maryann Place was at the polling place for the entire day and did not see any signs in the election polling place other than the signs she posted consisting of sample ballots. DSMF ¶ 39.

At the June 13 election, a majority of voters voted to overrule the Council's approval of the rezoning request.[6] PSMF ¶ 14, Complaint ¶ 17. The Council adopted rezoning ordinance was repealed and prevented from taking effect.

---

[6] Question # 1 was approved by the Town's voters by a vote of 1,193 in favor of the overrule petition to 982 opposed. DSMF ¶ 22.

8

Count I alleges that the petition failed to conform to the statutory requirements for citizen initiated petitions and is therefore void as a matter of law. Furthermore, Count I alleges that the June 13th election is invalid as a result of the invalid petition and because supporters of the petition engaged in illegal polling place engineering. Count II alleges that the petition constitutes an unlawful and invalid attempt to conduct zoning by referendum and is therefore void.

## DISCUSSION

### 1. Overrule Petition

There is no dispute that the overrule petition was not verified and certified by the circulator. The only issue is whether Section 11.03 of the Town's Charter requires citizen initiated petitions for the overrule of Town Council action to comply with the requirements for petitions circulated under State law. The Plaintiffs argument is as follows:

Section 11.03 of the Kittery Town Charter states:

> If, within 30 days after the enactment of any ordinance, a petition signed by not less than 10% of the qualified voters of the town is filed with the town clerk requesting its reference to a referendum, the council shall call a public hearing as provided in section 2.14, subsection 2, but to be held within 30 days from the date of the filing of such petition with the town clerk, and shall within 14 days after said public hearing call a <u>special town election</u> for the purpose of submitting to a referendum vote the question of repealing such ordinance. Pending action by the voters of the town, the referred ordinance shall be suspended upon receipt of the petition by the town clerk until it has received a vote of the majority of the legal votes case on said question. (emphasis added).

Because the Town is required to call an "election" for the purpose of submitting the petition to a referendum vote, the Plaintiffs argue that one must

9

refer to Section 10.03 of the Charter. Section 10.03 provides that:

> The provisions of the <u>statutes of the State of Maine</u> relating to the qualification of voters, the registration of voters, the nominations for any office, the manner of voting, absentee voting, the duties of election officers and <u>all other particulars relative to preparation for, conducting and management of elections,</u> so far as they may be applicable, <u>shall govern all elections,</u> except as otherwise provided in this charter. <u>State law reference - elections generally, 21-A M.R.S.A. § 1 et seq. town meetings and elections, 30-A M.R.S.A. § 2521 et seq.</u> (emphasis added).

By reference to elections and hence Section 10.03 of the Charter, Plaintiffs argue that the Section 11.03 requirements for overrule petitions are necessarily those found in Title 21-A of the Maine Revised Statutes. Specifically, Plaintiffs argue that the petitions should have included the signer's printed name, 21-A M.R.S.A. § 354(3), the signer's street address *and* municipality of registration, 21-A M.R.S.A. § 354(4), and the circulators of the petition should have verified by oath or affirmation before a notary public or other person authorized by law to administer oaths that all of the signatures on the petition were made in the circulator's presence and that to the best of the circulator's knowledge and belief each signature is the signature of the person whose name it purports to be, and that each signer is a resident of the electoral division named in the petition. 21-A M.R.S.A. § 354(7)(A). Because the overrule petition did not include the municipality of registration of the voters or any verification or certification as required by 21-A M.R.S.A. § 354[7], Plaintiffs contend that the petition is void and of no force and effect.

---

[7] Note, 21-A M.R.S.A. § 354 applies to nomination petitions. However, 21-A M.R.S.A. § 902 governs referendum petitions provided for in the Maine Constitution, art. IV, pt. 3 and states that "the petitions must be signed, verified and certified in the same manner as are nonparty nomination petitions under section 354, subsections 3 and 4 and subsection 7, paragraphs A and C."

10

The Town argues that pursuant to its home rule authority, the Town of Kittery has adopted a local initiative and referendum procedure. The Town argues that the Charter does not require that a Section 11.03 petition be verified or certified under oath by the circulator of the petition. Rather, the Town argues that Section 11.03 of the Charter provides a mechanism by which voters can elect to repeal an ordinance adopted by the Town Council: the overrule petition must be timely filed and signed by not less than 10 percent of qualified voters of the Town. This issue, the Town argues, was settled by the Law Court in Albert v. Town of Fairfield, 597 A.2d 1353 (Me. 1991).

In Albert, the town council accepted a certain street as a town way. Within thirty days petitions were filed by residents of the town seeking to overturn the acceptance of the street. Id. at 1354. Although the validity of the petitions was challenged, the town council determined that the petitions were valid and called a special election to vote on the referendum. Id. The election resulted in a vote rejecting the council's acceptance of the street. Plaintiffs filed a complaint arguing that the procedure for gathering the petitions was defective and that the election was therefore invalid. The petitions included the signer's signature, place of residence street number and street.[8] The petitions did not include the name of the circulator, were not verified as to the authenticity of the signatures, did not include complete instructions to inform the signer, circulator and clerk of the statutory and constitutional requirements, and were not on forms supplied by the town clerk. Id.

---

[8] See sample petition, attached to Complaint in Albert v. Town of Fairfield.

11

at 1355 & fn. 2.

The referendum procedure for the Town of Fairfield was set forth in section

703 of the Town's Charter:

> All actions shall be subject to overrule by Referendum as follows: If within 30 days after the enactment of any such Action, not less than 10% of the number of votes for all candidates for governor cast in the Town of Fairfield at the next previous gubernatorial election is filed with the Town Clerk requesting its reference to a referendum, the Council shall call a public hearing as provided in section 204(6) to be held within 30 days from the date of filing such petition with the Town Clerk, and shall within 30 days after said public hearing call a special town election for the purpose of submitting to a referendum vote the question of adopting such Action. Pending action by the voters of the Town, the referred Action shall be suspended from becoming effective until it has received a vote of the majority of the voters voting on said question.

Because section 703 of the Fairfield Charter did not contain a provision

governing the form and methods of preparation, circulation and verification of the

petition, plaintiffs argued that section 203 of the Charter applied. Section 203

provided:

> Nominations and elections shall be carried out in the manner prescribed by the general law relating to municipalities.

The "general law relating to municipalities" is contained in 30-A M.R.S.A.

and incorporates the elections laws of Title 21-A M.R.S.A., which in turn

incorporates the Maine Constitution. Plaintiffs argued that the procedures in Title

21-A and the Constitution were made applicable to the Fairfield referendum by

section 203 of the Charter. Id. at 1356.

The Law Court rejected this argument. The Court first rejected the notion

12

that "elections" in section 203 was synonymous with "referendum" in section 703.[9]

Id. The Court then concluded that section 203 of the charter was not intended to adopt the constitutional and statutory provisions dealing with a statewide referendum. The Court stated that "municipalities are free to impose different requirements than those governing statewide petitions. In reviewing referendum procedures, we ask: 'Is any invalidity disclosed in the machinery adopted which would require a determination that it is not a valid system under the Constitution?' Although the procedures are significantly less formal than those adopted for statewide elections, plaintiffs have demonstrated no constitutional invalidity." Id. (internal citations omitted).

Plaintiffs concede that they are making substantially the same argument in this case that the plaintiffs of Fairfield made in Albert. The critical difference however, Plaintiffs argue, is the language contained in the general election Charter provisions. The Kittery Charter provision governing the conduct of municipal elections, Plaintiffs argue, is very explicit and does not just make a general reference to "general laws relating to municipalities." Rather, Plaintiffs argue that section

---

[9] But see 21-A M.R.S.A. § 1(2) & (36):

2. Any election. "Any election" means primary and general elections and referenda, whether regular or special.

36. Referendum. "Referendum" means an election for the determination of a question.

In stating that "elections" in section 203 of the Charter was not synonymous with "referendum" in section 703, the Law Court presumably concluded that either the above definitions did not apply to the Fairfield Charter or that the procedure governing referendum petitions was not encompassed within section 203 governing elections.

13

10.03 specifically references Title 21-A. Plaintiffs further argue that if Section 11.03 is not read in conjunction with Section 10.03 (and hence Title 21-A), a petition need only "request[] its reference to a referendum," contain signatures of not less than ten percent of the qualified voters of the town and be signed by the appropriate number of voters within thirty days after the enactment of the ordinance it seeks to overturn.

The Plaintiffs' reasoning is unpersuasive. Albert controls the present case. As the Court stated in Albert, Towns are free to adopt whatever measures they deem sufficient to initiate the referenda process, provided that such measures are not inconsistent with Maine's Constitution or the Town Charter. The Town of Kittery was free to impose different (and less formal) requirements than that required in statewide referendums. Section 11.03 of the Kittery Charter is essentially identical to the Section 703 of the Fairfield Charter. Although the Town is required under Section 11.03 to submit the petition to a referendum vote, Section 10.03 (like Section 203 of the Town of Fairfield's Charter) does not govern the procedure for referendum petitions. The requirements set forth in Section 11.03 exclusively and satisfactorily prescribe the procedure necessary to circulate an overrule petition.

2. Illegal Electioneering

The Plaintiffs allege that supporters of the overrule petition engaged in polling place electioneering. In Maine, pursuant to 21-A M.R.S.A. § 682, certain activities are unlawful on an election day. It is a Class E crime to influence or attempt to influence another person's decision regarding a ballot issue within 250

14

feet of the entrance to the polling place or within the polling place. 21-A M.R.S.A. § 682(2). It is also a Class E crime to display advertising material intending to influence the opinion of the voters within 250 feet of the entrance to the voting place. 21-A M.R.S.A. § 682(3). The Election Warden is the individual designated by state statute to "enforce the law governing voting and counting procedures at the voting place over which he has jurisdiction on election day." 21-A M.R.S.A. 662(1). The Election Warden is also required by statute to "keep order at all times in and around the voting place" and is authorized to remove any person "who creates a disturbance or otherwise violates the law." 21-A M.R.S.A. § 662(2).

The Election Warden, Elaine Plante, did not see any signs on the walls of the polling place. DSMF ¶ 8. The only signs she did see at the polling place were 8 1/2 x 11 signs on the petition tables which she presumed were announcing the nature of the petition. **Plante Depo., Tab 1, p. 30.** Plante testified that because of the layout of the polling place, voters only saw these small signs after they had voted, and she thought these signs were appropriate. **Plante Depo., Tab 1, p. 30.** The Town Clerk, Maryann Place, who was at the polling place during the entire day did not see any signs in the polling place other than the signs that she posted consisting of sample ballots. DSMF ¶ 39.

Bruce Lakin, an active opponent of the rezoning effort, was working at the petitioners' table from approximately 10:00 a.m. to 1:00 p.m. on election day. Lakin Affidavit ¶ 2, 3. According to Lakin, he was not at the polling place in any capacity regarding the two referendum issues that were on the ballot on June 13. Rather,

15

Lakin testified that on election day he was collecting signatures for a proposed petition to be submitted to the Kittery Town Clerk requesting that the issue of retroactivity concerning an amendment to the Mixed Use Zone be placed on the ballot for future consideration by the voters of Kittery.[10] **Id. at ¶ 4, 6.**

Terry Gagner, Mark Sousa and Robert Wyman all testified that they saw at least one sign directed at stopping commercial development in Kittery. Specifically, Gagner testified that when he voted at approximately 11:00am, he saw a sign posted behind the petitioners' table with a slogan that conveyed the message of "stop mall sprawl." **Plaintiffs' Reply SMF ¶ 5.** Only Gagner has testified that he could see this sign when he <u>entered</u> the polling place. Sousa voted at approximately 11:30 a.m. and testified that as he exited the polling place, he saw a cardboard sign, approximately one foot by one and a half feet hanging on the wall behind one of the petitioners tables. **Sousa Affidavit ¶ 7.** Sousa did not remember the exact wording of the sign, but believed the message was "if you voted against the Weathervane Rezone, please sign here."[11] Id. Robert Wyman voted between 4-5:00 p.m. After he

---

[10] 21-A M.R.S.A. § 662(4) provides:
**Collection of signatures.** The warden may select and designate a specific location at the voting place, accessible and observable by the voters, where the collection of signature may take place. Persons collecting signatures at the polls may make arrangements with the clerk prior to election day and with the warden on election day. The warden may limit the number of persons collecting signatures to one for each specific question, candidate or issue. Persons collecting signatures may not solicit a voter's signature until the voter has completed voting. The warden may direct the removal, under subsection 2, paragraph A, of any person collecting signatures who does not comply with the requirements of this subsection.

[11] As noted earlier, Sousa also testified that after he exited the voting area at least two people mentioned to him that there was a sign concerning the Weathervane Rezone hanging in the area of the petitioners' table. **Sousa Affidavit ¶ 9.** This allegation, however, is inadmissible hearsay. <u>See</u> M.R.Civ. P. 56(e).

16

voted and was exiting the polling place, Wyman testified that he saw a sign approximately 12 inches by 24 inches propped up on the petitioners' table stating (Wyman does not remember the exact wording): "if you voted 'no,' stop here and sign." **Wyman Affidavit ¶ 6.**

In addition to the alleged sign(s) intended to influence voters, Plaintiffs also argue that the individual at the petitioners' table that Ms. Plante had to confront several times may have inappropriately influenced voters. As well, Mr. Gagner testified that either Gay or Bruce Lakin were talking to voters entering and exiting the polling place. **Plaintiffs' Opposing SMF ¶ 17.** Nowhere have Plaintiffs alleged that voters were actually influenced by the alleged illegal electioneering or that their cause was prejudiced in any way.

The parties' arguments can be summarized as follows: the Town essentially argues that the Plaintiffs' allegations are vague and that the Court should defer to the Election Warden and her testimony that there was no illegal electioneering at the polling place; Plaintiffs argue that they have generated an issue of material fact regarding whether or not there was illegal electioneering at the June 13 election. Plaintiffs argue that because of the illegal electioneering, the June 13 election must be judicially declared void and of no force and effect.

No caselaw could be found regarding illegal electioneering at the polling place or the deference afforded to an Election Warden regarding election conduct. The Law Court has stated that "wherever possible from a standpoint of legal justice to validate an election, it is the duty of the court to do so." Farris v Libby, 141 Me. 362, 368, 44 A.2d 216, 219 (1945).

17

Although Maine law specifies that the Election Warden is responsible for keeping order at the voting place and enforcing the law governing voting procedures, at the summary judgment stage, the Election Warden's testimony that there was no illegal electioneering on June 13, should not be afforded special deference. It is impermissible, at the summary judgment stage, for the Court to assess credibility. See Fisherman's Wharf Assoc. v. Verrill & Dana, 645 A.2d 1133, 1136 (Me. 1994); Levesque v. Chan, 569 A.2d 600, 602 (Me. 1990). At the summary judgment stage, the task of the trial court is not to decide any disputed factual questions, but to determine whether the record before the court generates a genuine issue of material fact. Fisherman's Wharf Assoc. v. Verrill & Dana, 645 A.2d at 1135. Summary judgment may be granted only where the facts before the court so conclusively preclude recovery by one party that judgment in favor of the other is the only possible result as a matter of law. Green v. Cessna Aircraft Co., 673 A.2d 216, 218 (Me. 1996). Because it is disputed whether or not signs advocating the petitioners' position were present in the polling place and whether or not conversations emanating from petitioners' table constituted illegal electioneering, summary judgment on Count I is not appropriate.[12]

3. Zoning by Referendum

---

[12] As noted above, it is a Class E crime to influence or attempt to influence voters within 250 feet of the entrance to the polling place or within the polling place itself. Maine law does not require proof that voters were actually influenced. See 21-A M.R.S.A. § 682(2) & (3). However, even assuming the presence of signs or inappropriate conversations at the petitioners' table, it is unclear whether this is sufficient to declare the entire election null and void. At trial, the parties should be prepared to address the issue of whether or not the Plaintiffs must show that voters were influenced by the alleged illegal electioneering, if indeed illegal electioneering occurred.

18

Count II of the Complaint alleges that the "petition constitutes an unlawful and invalid attempt to conduct zoning by referendum, and thus is void and of no force and effect."

In relation to matters which are local and municipal in character, towns have been granted "home rule" by the Maine Constitution. Me. Const. Art. VIII, pt. 2, § 1.[13] Article IV, Part 3, Section 21 of the Maine Constitution authorizes city councils to establish initiative and veto procedures for direct voter consideration of municipal affairs. It cannot be seriously questioned that municipal zoning is a matter of municipal concern for Section 21 purposes. Pursuant to Section 21, the Town of Kittery has established initiative procedures in section 11.02 of the Town's Charter. Section 11.02 provides that the voters of the Town may at any time propose the enactment of any ordinance by filing a petition signed by not less than 10% of the qualified voters of the town with the town clerk.[14] Proposed zoning ordinances are not listed as exceptions to the initiative procedure. If qualified voters of the Town of Kittery can, consistent with the Maine Constitution and Town Charter, initiate a new zoning provision, it would seem anomalous if they could not, by Charter, be granted the right to repeal a Council adopted, but not yet effective

---

[13] Me. Const. art VIII, pt. 2, § 1 provides that: "The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character. The Legislature shall prescribe the procedure by which the municipality may so act."

[14] Section 11.02 of the Charter provides that:

Voters of the town may at any time propose an enactment of any lawful ordinance by filing a petition stating the complete text of such ordinance and signed by not less than 10% of the qualified voters of the town, with the town clerk. . ..

19

ordinance and maintain the existing zoning classification. See Bird v. Town of Old Orchard Beach, 426 A.2d 370, 372 (Me. 1981)("municipalities in local and municipal affairs may exercise any power or function granted them by the State Constitution, the general law or the municipal charter, not otherwise prohibited or denied expressly or by clear implication by the constitution, the general law, or the charter itself").

The Plaintiffs apparently do not argue that, in general, a petition to overrule the action of Town Council pursuant to § 11.03 is unlawful. Rather, Plaintiffs argue that the petition at issue constituted an unlawful attempt to conduct zoning by referendum because both the Kittery Planning Board and the Conservation Commission determined that the Plaintiffs' proposed rezoning would be in compliance with the Comprehensive Plan, and the overrule petition effectively negated the Town's Council's decision to make the property consistent with the Comprehensive Plan.

Under 30-A M.R.S.A. § 4352(2), a zoning ordinance must be pursuant to and consistent with a comprehensive plan adopted by the municipal legislative body. It is not disputed that the Plaintiffs' parcel is located in a growth area under the Town's current Comprehensive Plan. However, when the Town Council adopted the Comprehensive Plan in July 1989, one of the principal goals was to "manage development to ensure that it has a positive impact on the town. . . and that Kittery's quality of life and coastal and rural resources are protected." Comprehensive Plan, p. 67, File 2, Tab C. Other goals include to "strive for a balance

between residential and non-residential development. . ." and to "preserve Kittery's rural character. . ." **Id. at 70, 81.** The existing zoning classification of residential use is also consistent with the Comprehensive Plan and the overrule petition was in harmony with the Comprehensive Plan. "It is not for the Court to dictate to the voters what specific methods they must adopt to reach the stated goals of the comprehensive plan. . . That is a policy decision that must be left to . . . the voters." City of Portland v. Fisherman's Wharf Association, CV-87-555 (Me. Super Ct. Cum. Cty., Jan. 10, 1991)(Brodrick, J.).[15]

The entry will be as follows:

1) Plaintiffs' Motion for Summary Judgment is Denied.

2) Defendant's Motion for Summary Judgment on so much of Count I as challenges the validity of the petitions and with respect to Count II is Granted; Defendant's Motion with respect to illegal election practices is Denied and the issue will be set for hearing.

The clerk may incorporate the Decision and Order in the docket by reference.

Dated:     August 3, 2001

J. M. Fortin, Esq. - PLS
D. A. McEachern, Esq. - DEF
W. H. Dale, Esq., Esq. (co-counsel) DEF

G. Arthur Brennan
Justice, Superior Court

---

[15] See File 1, Tab 6.